# UNITED STATES OF AMERICA
## IN THE DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

K.S.,                                            Case No. 14-
                                                 Hon.
    Plaintiff,                Mag.

v.

DETROIT PUBLIC SCHOOLS, a
Michigan municipal corporation, CHARLES PUGH,
ROY ROBERTS, ROBERT BOBB, BERRY GREER,
and MONIQUE MCMURTRY,

    Defendants.
_____/

SEIKALY & STEWART, P.C.
Attorneys for Plaintiff
WILLIAM R. SEIKALY (P33165)
CHOI T. PORTIS (P77123)
BENJAMIN J. WILENSKY (P75302)
30300 Northwestern Hwy., Ste. 200
Farmington Hills, Michigan 48334
(248) 785-0102
wrs@sslawpc.com
_____/

## COMPLAINT AND DEMAND FOR TRIAL BY JURY

NOW COMES the Plaintiff, K.S., by and through his attorneys, SEIKALY & STEWART, P.C., and for his Complaint says:

## PARTIES

1.    Plaintiff was, at all times relevant to this action, a resident of the City of Detroit, County of Wayne, State of Michigan.

2.     Defendant Detroit Public Schools (hereinafter "DPS") is a school district and a Michigan municipal corporation located in the County of Wayne, State of Michigan.

3.     At all times relevant to this action, defendant DPS was an educational institution and a recipient of federal funds and federal financial assistance.

4.     Defendant Charles Pugh (hereinafter "PUGH") was, at all times relevant to this action, Council President of and for the City of Detroit.

5.     Upon information and belief, defendant PUGH is a resident of the County of Bronx, State of New York. Furthermore, as an employee of the City of Detroit, he conducted his business in the County of Wayne, State of Michigan.

6.     Defendant Roy Roberts (hereinafter "ROBERTS") was, at all times relevant to this action, the Emergency Financial Manager for defendant DPS.

7.     Upon information and belief, defendant ROBERTS is a resident of the County of Oakland, State of Michigan. Furthermore, as an employee of defendant DPS, defendant ROBERTS conducted his business in the County of Wayne, State of Michigan.

8.     Defendant Robert Bobb (hereinafter "BOBB") was, at all times relevant to this action, the Emergency Financial Manager for defendant DPS.

2

9.     Upon information and belief defendant BOBB is a resident of the City of Washington, District of Columbia. Furthermore, as an employee of defendant DPS, he conducted his business in the County of Wayne, State of Michigan.

10.     Defendant Berry Greer (hereinafter "GREER") was at all times relevant to this action, a building principal of the defendant DPS for the Frederick Douglass Academy for Young Men (hereinafter "FDAYM").

11.     Upon information and belief, defendant GREER is a resident of the County of Oakland, State of Michigan. Furthermore, as an employee of defendant DPS, defendant GREER conducted his business in the County of Wayne, State of Michigan.

12.     Defendant Monique McMurtry (hereinafter "MCMURTRY") was, at all times relevant to this action, the Assistant Principal for defendant DPS.

13.     Upon information and belief, defendant MCMURTRY is a resident of the County of Oakland, State of Michigan. Furthermore, as an employee of defendant DPS, defendant MCMURTY conducted her business in the County of Wayne, State of Michigan.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction of plaintiff's federal claims pursuant to 28 U.S.C §§1331 and 1333. The Court has supplemental jurisdiction of plaintiff's state law claims under 28 U.S.C. §1367(a).

3

15.    The amount in controversy exceeds Seventy-Five Thousand ($75,000.00) Dollars, exclusive of costs, interest, and attorney fees.

16.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because the causes of action arose entirely within this District, as each individual defendant resides in this District and/or transacted his or her business within this District, and because the governmental defendant DPS, is found within this District.

## COMMON ALLEGATIONS

17.    Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

18.    This is an action for a violation of civil rights under the laws of the United States.

19.    During all relevant times, each defendant was acting under the color of state and federal law.

20.    At all times relevant to this cause of action, plaintiff was a student of defendant DPS, specifically attending FDAYM.  At all times relevant to this cause of action, defendants ROBERTS, BOBB, GREER, and MCMURTRY were employees of defendant DPS.

21.    At all times relevant to this cause of action, defendant PUGH was the President of Detroit City Council and President of the Charles Pugh Leadership Forum (hereinafter "CPLF").

4

22.    By nature of his position as President of the CPLF, defendant PUGH was given unprecedented access and control over male students at FDAYM, without any form of supervision, monitoring or control by DPS. The plaintiff's parents entrusted the control of plaintiff to DPS.

23.    At the beginning of the plaintiff's participation in the CPLF, defendant PUGH began to provide extra attention to plaintiff and began to "groom" him in preparation for making sexual advances to the plaintiff.

24.    At a time beginning no later than May 2013, defendant PUGH, as part of the grooming process, began assisting plaintiff with obtaining a job. Defendant PUGH specifically informed plaintiff that he would take him to purchase  clothing for his "job interview," Plaintiff indicated that he needed to get permission from his Mother. Plaintiff used defendant PUGH's cell phone to call his Mother, who specifically did not give him permission to go with defendant PUGH.

25.     At a time beginning no later than May 2013, defendant PUGH told plaintiff to meet him outside the school around 2:00 p.m., knowing that any such meeting would be without his Mother's approval.

26.    At around 2:00 p.m. plaintiff exited the school and got into defendant PUGH's black Lincoln Town Car. PUGH and plaintiff left the school and drove to the Men's Warehouse, K&G Men's Warehouse, and Metro PCS, all located in the City of Madison Heights, County of Oakland, State of Michigan.

5

27.    On that same day, defendant PUGH learned for the first time that plaintiff did not have a cell phone and that all of defendant's text messages had been sent to plaintiff's Mother's phone.

28.    Plaintiff's mother believed that these text messages were from a girl that had a crush on plaintiff, and did not know that in fact they were from defendant PUGH.

29.    Defendant PUGH then took plaintiff to Metro PCS in Madison Heights, where defendant PUGH purchased a phone and provided it to plaintiff.

30.    That same day, while visiting K&G Men's Warehouse and Men's Warehouse, each time plaintiff tried on a pair of pants, defendant PUGH doted on the plaintiff by tucking in his pants and adjusting the clothes in a manner that made plaintiff very uncomfortable. Upon their departure from the clothing store, defendant PUGH stopped at CVS to withdraw money from an ATM. When defendant PUGH returned to the vehicle, PUGH handed plaintiff Forty ($40.00) Dollars and, while smiling, put his hand on plaintiff's upper thigh.

31.    Plaintiff removed defendant PUGH's hand from his thigh, but defendant PUGH laughed while staring at plaintiff.

32.    On the same evening, defendant PUGH began text messaging plaintiff on a regular basis, aggressively pursuing plaintiff for a sexual relationship, and offering him money and gifts in exchange for sex or videos of the plaintiff

performing sexual acts.  Defendant PUGH did so based on the grooming that he had performed on plaintiff while plaintiff was part of the CPLF at the FDAYM.

33.   At a time beginning no later than May 2013, plaintiff's Mother contacted defendant MCMURTRY who stated that defendant MCMURTRY had knowledge of the events, and that plaintiff's Mother's "parental concerns had not been forgotten."

34.   On or about May 31, 2013, defendant PUGH began bribing plaintiff, promising him gifts, such as video games and money for performing sexual acts and/or making videos of plaintiff performing sexual acts. Defendant PUGH made it clear to plaintiff that his career would be ruined if anyone found out about these bribes, and continuously told plaintiff to keep their conversations private.

35.   On or about June 1, 2013, plaintiff told defendant PUGH he needed One Hundred Sixty ($160.00) Dollars, and defendant PUGH agreed to give plaintiff the money, in exchange for plaintiff  making  a video of himself masturbating.

36.   On or about June 1, 2013, plaintiff, via text messaging, told defendant PUGH he did not feel comfortable making a video for him. Defendant PUGH replied that plaintiff would not receive the money unless he made the video.

37.   On or about June 2, 2013, plaintiff recorded a video of himself masturbating on an iPod given to him by defendant PUGH and gave it to defendant PUGH in exchange for One Hundred Sixty ($160.00) Dollars.

38.   On or about June 3, 2013, defendant PUGH, via text messaging, offered to perform oral sex on plaintiff in exchange for money.

39.   On or about June 4, 2013, plaintiff's Mother discovered the events, which had transpired between defendant PUGH and plaintiff.

## COUNT I: §1983 CLAIM AGAINST DEFENDANT DPS

40.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

41.   Plaintiff's constitutional rights to personal security and bodily integrity, including the right to be free from abusive behavior, were established and well-known by defendant DPS at the time of defendant PUGH's sexual misconduct on plaintiff.

42.   DPS, through its employees, was aware of defendant PUGH's physicality, favoritism, and sexual harassment toward certain students, and particularly plaintiff.

43.   Defendant DPS, through its employees, required all seniors at the FDAYM to attend and complete the CPLF as a requirement for graduation.

44.     Defendant DPS, through its employees, allowed defendant PUGH to place construction paper over the windows to the entry doors of the classroom in which the CPLF was held, allowing defendant PUGH to obscure events taking place within, despite defendant DPS's knowledge of defendant PUGH's improper and obscure motives and propensities.

45.     Defendant DPS, though its employees, failed to take corrective action to prevent defendant PUGH's conduct, thereby increasing the risk of abuse to plaintiff.

46.     Defendant DPS established written policies, consistent with state law, that the abuse of students was prohibited, and that those who had reason to believe that such conduct was occurring had the duty to report it.

47.     Defendant DPS failed to enforce the reporting obligations stated in its written policies, and failed to impose any sanctions, even after it became aware of the failure to report in a particular case.

48.     As a result of the failure to enforce the policy and obligation to report other conduct by the District, there was a *de facto* policy created that individuals believed such abusive conduct should not be reported.

49.     Defendant DPS knew there existed, at the very least, a substantial risk that plaintiff was being abused and could not protect himself from it.

9

50.    Despite having this knowledge, defendant DPS did not take appropriate action to prevent plaintiff from being abused. Therefore, defendant was deliberately indifferent to known facts establishing an unreasonable risk to plaintiff's safety and well-being.

51.    Defendant DPS, through its decision-making agents, officials, and administrators, adopted, maintained, tolerated and/or acquiesced in the following customs, policies and practices, among others:

     a.     Ignoring evidence of behavior that was known to violate the rights of students to be free from assault, abuse, and harassment;

     b.     Failing to comply with M.C.L. §722.623, which requires reporting to proper authorities when there is reasonable cause to suspect that a child is being abused;

     c.     Failing to properly supervise employees and/or volunteers, including, but not limited to defendant PUGH, to prevent the employees and/or volunteers' physical, sexual, and emotional abuse of students;

     d.     Failing to adequately investigate or act upon information brought to the attention of administrators regarding the abuse of plaintiff.

52.     The culture, customs, practices, and/or policies in place at defendant DPS created an environment where the abuse plaintiff suffered was allowed to take place and continue without fear of reprisal.

53.     The culture, customs, practices, and/or policies in place in defendant DPS resulted in and led to the deprivation of plaintiff's constitutional rights.

54.     Although there was a clear and persistent pattern of abuse to plaintiff, defendant DPS was deliberately indifferent to known facts, which demonstrated an unreasonable risk to plaintiff's safety such that defendant DPS tacitly approved, condoned, tolerated, and/or acquiesced in the deprivation of plaintiff's constitutional rights.

55.     Defendant DPS's conduct, through its employees, was not merely sloppy, reckless, or negligent. Defendant DPS, through its employees, possessed information showing a strong likelihood that plaintiff was being abused, such that defendant DPS's failure to take adequate precautions amounted to deliberate indifference to plaintiff's clearly established constitutional rights.

56.     Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well-known by defendant DPS at the time of defendant PUGH's sexual misconduct to plaintiff.

57.    Plaintiff's rights to the equal protection of the laws, and to the rights and privileges afforded by the Constitution and laws of the United States were violated, in contravention of 42 U.S.C. §1983.

58.    Defendant DPS's conduct and responses were clearly unreasonable in light of the known facts and circumstances.

59.    Defendant DPS, through its agents and employees, affirmatively placed plaintiff in a position of peril, thereby exposing him to a danger that he would not have otherwise faced.  In light of this knowledge by defendant DPS's agents and employees, defendant DPS knew of the obvious danger plaintiff faced and acted with deliberate indifference to it.

60.    As a result of defendant DPS's conduct, though its employees, plaintiff has suffered severe physical, psychological, and emotional injuries, as well as serious impairment to his academic and social development.

61.    Defendant DPS's deliberate indifference was a moving force or was a direct causal link in the violation of plaintiff's constitutional rights, all in violation of 42 U.S.C. §1983.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT II: §1983 CLAIM AGAINST DEFENDANT ROBERT BOBB

62.     Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

63.     At a time beginning no later than March 2009, Governor Jennifer Granholm appointed defendant BOBB as the Emergency Financial Manager for defendant DPS.

64.     At all times relevant to this action defendant BOBB was employed as the Emergency Financial Manager for defendant DPS, acting under color of state law.

65.     By nature of his appointment as Emergency Financial Manager for DPS, defendant BOBB was given the authority to make key decisions for the District, acting under color of state law.

66.     At a time beginning no later than 2009, defendant BOBB overrode a school board decision of DPS prohibiting PUGH from establishing the CPLF at the FDAYM.

67.     As the Emergency Financial Manager, defendant BOBB stood in the shoes of the Superintendent for defendant DPS.

68.     As the Emergency Financial Manager, defendant BOBB was responsible for the supervision of defendant DPS's educators, volunteers, and its

professional and support staff.  Defendant BOBB was also responsible for ensuring that all operations of the DPS complied with all state laws.

69.     Defendant DPS's policies were controlled by defendant BOBB and he was invested with latitude and discretion as to how best to carry out defendant DPS's policies.

70.     As defendant DPS's Emergency Financial Manager, defendant BOBB was its Chief Administrative Officer and responsible for the development, supervision and operation of the school program and facilities.

71.     As defendant DPS's Emergency Financial Manager, given his duties and responsibilities, defendant BOBB was directly responsible for adopting, maintaining, tolerating, and/or acquiescing in the following customs, policies, and practices, among others:

a.     Ignoring evidence of behavior that was known to violate the rights of students to be free from assault, abuse, and harassment;

b.     Failing to comply with M.C.L. §722.623, which requires reporting to proper authorities when there is reasonable cause to suspect that a child is being abused;

14

c.      Failing to properly supervise employees and/or volunteers, including, but not limited to defendant PUGH, to prevent physical, sexual, and emotional abuse of students;

d.      Failing to adequately investigate or act upon information brought to the attention of administrators regarding the abuse of plaintiff;

e.      Continuing to voluntarily extend and provide pay and benefits to defendants MCMURTRY and GREER after serious allegations of misconduct were known to them and whereby they failed to take any action.

72.    The culture, customs, practices, and/or policies defendant BOBB created, established, tolerated and/or acquiesced in, created an environment where abuse of students was allowed to take place and continue without fear of reprisal.

73.    The culture, customs, practices, and/or policies defendant BOBB created, established, tolerated and/or acquiesced in, resulted in and led to the deprivations of plaintiff's constitutional rights.

74.    Although there was a clear and persistent pattern of abuse, and despite the fact that defendant BOBB had actual knowledge that plaintiff could not protect himself from defendant PUGH's sexual misconduct, defendant BOBB was deliberately indifferent to known facts which demonstrated an unreasonable risk to

15

plaintiff's safety such that defendant BOBB tacitly approved, condoned, tolerated, and/or acquiesced in the deprivation of plaintiff's constitutional rights.

75.     Defendant BOBB's conduct was not merely sloppy, reckless, or negligent. Defendant BOBB possessed information showing a strong likelihood that plaintiff was being abused, such that defendant BOBB's failure to take adequate precautions amounted to deliberate indifference to plaintiff's clearly established constitutional rights.

76.     Defendant BOBB's conduct and responses were a proximate cause of the deprivations of plaintiff's clearly established constitutional rights to be free from abuse.

77.     Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well known to defendant BOBB at the time of defendant PUGH's sexual misconduct regarding plaintiff.

78.     Plaintiff's rights to equal protection of the laws, and to the rights and privileges afforded by the Constitution and laws of the United States were in violation and contravention of 42 U.S.C. §1983.

79.     Defendant BOBB's knowledge of these facts and failure to protect plaintiff from harm affirmatively placed plaintiff in a position of peril, thereby exposing him to a danger that he would not have otherwise faced. In light of these

facts, defendant BOBB had knowledge of plaintiff's peril and acted with deliberate indifference to it.

80.     Defendant BOBB's acts and failures to act, his clearly unreasonable conduct and responses, his deliberate indifference to plaintiff's clearly established constitutional rights and his official policy of inaction constitute a violation of 42 U.S.C. §1983.

81.     As a result of defendant BOBB's conduct, plaintiff has suffered severe physical, psychological, and emotional injuries, as well as serious impairment to his academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant BOBB in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT III: §1983 CLAIM AGAINST DEFENDANT ROY ROBERTS

82.     Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

83.      At a time beginning no later than March 2011, Governor Rick Snyder appointed defendant ROBERTS as the Emergency Financial Manager for defendant DPS, to take over for previously appointed Emergency Financial Manager, co-defendant BOBB.

84.     At all times relevant to this action defendant ROBERTS was employed as the Emergency Financial Manager for defendant DPS, acting under color of state law.

85.     By nature of his appointment as Emergency Financial Manager for defendant DPS, defendant ROBERTS was given the authority to make key decisions for the District, acting under color of state law.

86.     As the Emergency Financial Manager, defendant ROBERTS stood in the shoes of the Superintendent for DPS.

87.     At a time beginning no later than 2011, defendant ROBERTS continued to enforce the decision put in place by defendant BOBB to allow the CPLF at the FDAYM.

88.     As the Emergency Financial Manager, defendant ROBERTS was responsible for the supervision of defendant DPS's educators, volunteers, professional and support staff. Defendant ROBERTS was also responsible for ensuring that defendant DPS's operations complied with all state laws.

89.     Defendant DPS's policies were controlled by defendant ROBERTS, and he was invested with latitude and discretion as to how best to carry out defendant DPS's policies.

90.    As defendant DPS's Emergency Financial Manager, defendant ROBERTS was its Chief Administrative Officer and responsible for the development, supervision, and operation of the school program and facilities.

91.    As defendant DPS's Emergency Financial Manager, given his duties and responsibilities defendant ROBERTS was directly responsible for adopting, maintaining, tolerating, and/or acquiescing in the following customs, policies, and practices, among others:

    a.    Ignoring evidence of behavior that was known to violate the rights of students to be free from assault, abuse, and harassment;

    b.    Failing to comply with M.C.L. §722.623, which requires reporting to proper authorities when there is reasonable cause to suspect that a child is being abused;

    c.    Failing to properly supervise employees and/or volunteers, including, but not limited to defendant PUGH, to prevent physical, sexual, and emotional abuse of students;

    d.    Failing to adequately investigate or act upon information brought to the attention of administrators regarding the abuse to plaintiff;

19

e.      Continuing to voluntarily extend and provide pay and benefits to co-defendants MCMURTRY and GREER after serious allegations of misconduct were known to them, and in which they failed to act upon.

92.    The culture, customs, practices, and/or policies defendant ROBERTS created, established, tolerated and/or acquiesced in, created an environment where the abuse of students was allowed to take place and continue without fear of reprisal.

93.    The culture, customs, practices, and/or policies defendant ROBERTS created, established, tolerated and/or acquiesced in, resulted in and led to the deprivations of plaintiff's constitutional rights.

94.    Although there was a clear and persistent pattern of abuse, and despite the fact that defendant ROBERTS had actual knowledge that plaintiff could not protect himself from defendant PUGH's sexual misconduct, defendant ROBERTS was deliberately indifferent to known facts which demonstrated an unreasonable risk to plaintiff's safety such that defendant ROBERTS tacitly approved, condoned, tolerated, and/or acquiesced in the deprivation of plaintiff's constitutional rights.

95.    Defendant ROBERTS's conduct was not merely sloppy, reckless, and/or negligent. Defendant ROBERTS possessed information showing a strong

likelihood that plaintiff was being abused, such that defendant ROBERTS's failure to take adequate precautions amounted to deliberate indifference to plaintiff's clearly established constitutional rights.

96.   Defendant ROBERTS's conduct and responses were a proximate cause of the deprivations of plaintiff's clearly established constitutional rights to be free from abuse.

97.   Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well known to defendant ROBERTS at the time of defendant PUGH's sexual misconduct to plaintiff.

98.   Plaintiff's rights to equal protection of the laws, and to the rights and privileges afforded by the Constitution and laws of the United States were in violation and contravention of 42 U.S.C. §1983.

99.   Defendant ROBERTS's knowledge of these facts and failure to protect plaintiff from harm affirmatively placed plaintiff in a position of peril, thereby exposing him to a danger that he would not have otherwise faced. In light of these facts, defendant ROBERTS had knowledge of plaintiff's peril and acted with deliberate indifference to it.

100.  Defendant ROBERTS's acts and failures to act, his clearly unreasonable conduct and responses, his deliberate indifference to plaintiff's

clearly established constitutional rights and his official policy of inaction constitute a violation of 42 U.S.C. §1983.

101.   As a result of defendant ROBERTS's conduct, plaintiff has suffered severe physical, psychological, and emotional injuries, as well as serious impairment to his academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant ROBERTS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT IV: §1983 CLAIM AGAINST DEFENDANT BERRY GREER

102.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

103.   At all times relevant to this action, defendant GREER was employed as the Principal for defendant DPS, acting under color of state law.

104.   At all times relevant to this action, defendant GREER was assigned to plaintiff's school.

105.   By nature of his position as the Principal of the FDAYM, defendant GREER was aware of all mandatory procedures.

106.  At a time beginning no later than 2009 and continuing until 2011, defendant GREER was aware of the procedures regarding covering the classroom windows during the CPLF classroom sessions.

107.  Defendant GREER, by nature of his position as the Principal of plaintiff's school, became aware of the inappropriate contact defendant PUGH had with plaintiff, failed to take corrective action to prevent defendant PUGH's conduct, thereby increasing the risk of abuse to plaintiff.

108.  Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well-known by defendant GREER at the time of defendant PUGH's sexual misconduct to plaintiff.

109.  Defendant GREER's knowledge of these facts and failure to protect plaintiff from harm affirmatively placed plaintiff in a position of peril, thereby exposing him to a danger that he would not have otherwise faced over an extended period of time, constituted an official policy of inaction.

110.  Defendant GREER's deliberate indifference, failure to report defendant PUGH's abusive actions to the appropriate authorities, and failure to enforce District policies were moving forces and/or direct causal links in violation of plaintiff's constitutional rights, and deliberate indifference amounted to and/or was pursuant to an official practice, policy, or custom of inaction in such circumstances, all in violation of 42 U.S.C. §1983.

23

111.   As a result of defendant GREER's conduct, plaintiff has suffered severe physical, psychological, and emotional injuries, as well as serious impairment to his academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant GREER in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT V: §1983 CLAIM AGAINST DEFENDANT MONIQUE MCMURTRY

112.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

113.   At all times relevant to this action, defendant MCMURTRY was employed as the Assistant Principal for defendant DPS, acting under color of state law.

114.   At all times relevant to this action, defendant MCMURTRY was assigned to plaintiff's school.

115.   By nature of her position as the Assistant Principal of the FDAYM, defendant MCMURTRY was aware of all mandatory procedures.

116.   At a time beginning no later than 2009 and continuing until 2011, defendant MCMURTRY was aware of the procedures regarding covering the classroom windows during the CPLF classroom sessions.

24

117.  At a time beginning no later than the 2012-2013 school year, defendant MCMURTRY became aware of inappropriate contact between plaintiff and defendant PUGH.

118.  At a time beginning no later than June 2013, defendant MCMURTRY received an email from plaintiff's Mother regarding inappropriate contact between plaintiff and defendant PUGH.

119.  Defendant MCMURTRY, by nature of her position as the Assistant Principal of plaintiff's school, became aware of the inappropriate contact defendant PUGH had with plaintiff, failed to take corrective action to prevent defendant PUGH's conduct, thereby increasing the risk of abuse to plaintiff.

120.  Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well-known by defendant MCMURTRY at the time of defendant PUGH's sexual misconduct to plaintiff.

121.  Defendant MCMURTRY's knowledge of these facts and failure to protect plaintiff from harm negatively placed plaintiff in a position of peril, thereby exposing him to a danger that he would not have otherwise faced over an extended period of time, constituting an official policy of inaction.

122.  Defendant MCMURTRY's deliberate indifference, failure to report defendant PUGH's abusive actions to the appropriate authorities, and failure to enforce district policies were moving forces and/or direct causal links in violation

25

of plaintiff's constitutional rights, and deliberate indifference amounted to and/or was pursuant to an official practice, policy, or custom of inaction in such circumstances, all in violation of 42 U.S.C. §1983.

123.   As a result of defendant MCMURTRY's conduct, plaintiff has suffered severe physical, psychological, and emotional injuries, as well as serious impairment to his academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant MCMURTRY in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT VI: § 1983 CLAIM AGAINST DEFENDANT CHARLES PUGH

124.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

125.   At all times relevant to this action, defendant PUGH was the President of the CPLF as well City Council President of the City of Detroit, acting under color of state law.

126.   By nature of his position as President of the CPLF, defendant PUGH was aware of all mandatory procedures for working in the FDAYM.

127.   At a time beginning no later than May 2013, as a part of the "grooming" process, defendant PUGH began assisting plaintiff in searching for

employment. Specifically, defendant PUGH informed plaintiff that defendant would take him out to buy clothing for an upcoming job interview.

128.  At a time beginning no later than May 2013, defendant PUGH, without plaintiff's Mother's permission took plaintiff to K&G Men's Warehouse, Men's Warehouse, and Metro PCS located in Madison Heights, Michigan.

129.  At a time beginning no later than May 2013, while visiting K&G Men's Warehouse, while plaintiff tried on pants, defendant PUGH doted on plaintiff, tucking his pants in a manner that made plaintiff very uncomfortable.

130.  At a time beginning no later than May 2013, upon their departure from K&G Men's Warehouse, PUGH stopped at CVS to withdraw money from an ATM. When defendant returned to the vehicle, he handed plaintiff Forty ($40.00) Dollars, and while smiling, put his hand on plaintiff's upper thigh. At that time, plaintiff removed defendant PUGH's hand wherein defendant PUGH stared and laughed at plaintiff.

131.  At a time beginning no later than May 2013, defendant PUGH began text messaging plaintiff on a regular basis, aggressively pursuing plaintiff for a sexual relationship, and offering him money and gifts in exchange for either sex or videos of plaintiff performing sexual acts. Defendant PUGH did so based on the "grooming" that he had performed on plaintiff while plaintiff was part of the CPLF at the FDAYM.

27

132.   On or about May June 1, 2013, plaintiff told defendant PUGH he needed One Hundred Sixty ($160.00) Dollars, and defendant PUGH agreed, in exchange for plaintiff making a video of himself masturbating.

133.   On or about June 1, 2013, plaintiff, via text messaging, told defendant PUGH he did not feel comfortable making a video for him. Defendant PUGH replied that plaintiff would not receive the money unless he made the video.

134.   On or about June 2, 2013, plaintiff recorded a video of himself masturbating on an IPod given to him by defendant PUGH and gave it to the defendant in exchange for One Hundred Sixty ($160.00) Dollars.

135.   On or about June 3, 2013, defendant PUGH, via text messaging, offered to perform oral sex on plaintiff, in exchange for money.

136.   Plaintiff's constitutional rights to personal security and bodily integrity were clearly established and well known to defendant PUGH at the time of his sexual misconduct on plaintiff.

137.   Defendant PUGH's actions deprived plaintiff of his right to personal security and bodily integrity, including his right to be free from sexual abuse at the hands of a public employee, and thus defendant PUGH violated the plaintiff's clearly established civil rights, in violation of 42 U.S.C. §1983.

138.   Defendant PUGH's actions violated the criminal code of the State of Michigan as well as policies and procedures that should have been in effect and in force by the  defendant DPS.

139.   As a result of defendant PUGH's sexual misconduct against plaintiff, he has suffered severe physical, psychological, and emotional injury, as well as serious impairment to his academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant PUGH in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT VII: ELLIOTT-LARSEN CIVIL RIGHTS ACT CLAIM (M.C.L. §37.2102) AGAINST DEFENDANTS ROY ROBERTS AND DPS

140.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

141.   Plaintiff is, under Michigan law, including, without limitation under the Elliot-Larsen Civil Rights Act (M.C.L. §37.2101, *et seq.*), a person protected from acts of abuse and discrimination by those who have supervisory control over him.

142.   At all times relevant hereto, defendant ROBERTS did, in fact, have supervisory control and corresponding obligations to plaintiff in his role as Emergency Financial Manager.

29

143.   At all times relevant hereto, defendant ROBERTS allowed plaintiff to be subjected to sexual abuse by defendant PUGH, while knowing such conduct was illegal and improper.

144.   Defendant ROBERTS's conduct occurred during the scope and course of his employment with defendant DPS.

145.   Absent supervisory control over plaintiff, ROBERTS would not have been in a position to, nor in fact would have been able to neglect plaintiff.

146.   Defendant DPS, through its employees, had actual and/or constructive notice of plaintiff's abuse.

147.   Pursuant to Michigan law, ROBERTS's employer, DPS is liable in *respondeat superior* for the actions and conduct of its employee.

148.   Defendant ROBERTS's conduct was and is a proximate cause of plaintiff's injuries, including his emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendants ROBERTS and DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## <u>COUNT VIII: ELLIOT-LARSEN CIVIL RIGHTS ACT CLAIM<br>AGAINST DEFENDANTS ROBERT BOBB AND DPS</u>

149.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

150.   Plaintiff is, under Michigan law, including, without limitation under the Elliot-Larsen Civil Rights Act (M.C.L. §37.2101, *et seq.*), a person protected from acts of abuse and discrimination by those who have supervisory control over him.

151.   At all times relevant hereto, defendant BOBB did, in fact, have supervisory control and corresponding obligations to plaintiff in his role as Emergency Financial Manager.

152.   At all times relevant hereto, defendant BOBB allowed plaintiff to be subjected to sexual abuse by defendant PUGH, while knowing such conduct was illegal and improper.

153.   Defendant BOBB's conduct occurred during the scope and course of his employment with defendant DPS.

154.   Absent supervisory control over plaintiff, defendant BOBB would not have been in a position to, nor in fact would have been able to neglect plaintiff.

155.   Defendant DPS, through its employees, had actual and/or constructive notice of plaintiff's abuse.

31

156.   Pursuant to Michigan law, defendant BOBB's employer, defendant DPS is liable in *respondeat superior* for the actions and conduct of its employees.

157.   Defendant BOBB's conduct was and is a proximate cause of plaintiff's injuries, including his emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendants BOBB and DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT IX: ELLIOTT-LARSEN CIVIL RIGHTS ACT CLAIM (M.C.L. §37.2102)  AGAINST BERRY GREER AND DPS

158.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

159.   Plaintiff is, under Michigan law, including, without limitation under the Elliot-Larsen Civil Rights Act (M.C.L. §37.2101, *et seq.*), a person protected from acts of abuse and discrimination by those who have supervisory control over him.

160.   At all times relevant hereto, defendant GREER did, in fact, have supervisory control and corresponding obligations to plaintiff in his role as the Principal of the FDAYM.

161.   At all times relevant hereto, defendant GREER allowed plaintiff to be subjected to sexual abuse by defendant PUGH, while knowing such conduct was illegal and improper.

162.   Defendant GREER's conduct occurred during the scope and course of his employment with DPS.

163.   Absent supervisory control over plaintiff, defendant GREER would not have been in a position to, nor in fact would have been able to neglect plaintiff.

164.   Defendant DPS, through its employees, had actual and/or constructive notice of plaintiff's abuse.

165.   Pursuant to Michigan law, defendant GREER's employer, defendant DPS is liable in *respondeat superior* for the actions and conduct of its employees.

166.   Defendant GREER's conduct was and is a proximate cause of plaintiff's injuries, including his emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendants GREER and DPS in an amount in excess of

Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT X: ELLIOTT-LARSEN CIVIL RIGHTS ACT CLAIM (M.C.L. §37.2102) AGAINST MONIQUE MCMURTRY AND DPS

167.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

168.   Plaintiff is, under Michigan law, including, without limitation under the Elliot-Larsen Civil Rights Act (M.C.L. §37.2101, *et seq.*), a person protected from acts of abuse and discrimination by those who have supervisory control over him.

169.   At all times relevant hereto, defendant MCMURTRY did, in fact, have supervisory control and corresponding obligations to plaintiff in her role as the Assistant Principal of FDAYM.

170.   At all times relevant hereto, defendant MCMURTRY allowed plaintiff to be subjected to sexual abuse by defendant PUGH, while knowing such conduct was illegal and improper.

171.   Defendant MCMURTRY's conduct occurred during the scope and course of her employment with DPS.

172.   Absent supervisory control over plaintiff, defendant MCMURTRY would not have been in a position to, nor in fact would have been able to neglect plaintiff.

173.   Defendant DPS, through its employees, had actual and/or constructive notice of plaintiff's abuse.

174.   Pursuant to Michigan law, defendant MCMURTRY's employer, defendant DPS is liable in *respondeat superior* for the actions and conduct of its employees.

175.   Defendant MCMURTRY's conduct was and is a proximate cause of plaintiff's injuries, including his emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development.

WHEREFORE, Plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendants MCMURTRY and DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT XI: ELLIOTT-LARSEN CIVIL RIGHTS ACT CLAIM (M.C.L. §37.2102) AGAINST DEFENDANTS CHARLES PUGH AND DPS

176.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

177.   Plaintiff is, under Michigan law, including, without limitation under the Elliot-Larsen Civil Rights Act (M.C.L. §37.2101, *et seq*) a person protected from acts of abuse and discrimination by those who have supervisory control over him.

178.   At all times relevant hereto, defendant PUGH did, in fact, have supervisory control and corresponding obligations to plaintiff in his role as President of the CPLF.

179.   At all times relevant hereto, defendant PUGH was an employee in fact and/or a *de facto* employee of the defendant DPS.

180.   At all times relevant hereto, defendant PUGH subjected plaintiff to sexual abuse, while knowing such conduct was illegal and improper.

181.   Defendant PUGH's conduct occurred during the scope and course of his employment with defendant DPS.

182.   Absent supervisory control over plaintiff, defendant PUGH would not have been in a position to, nor in fact would have been able to abuse plaintiff.

183.   Defendant DPS, through its employees, had actual and/or constructive notice of plaintiff's abuse.

184.   Pursuant to Michigan law, defendant PUGH's employer, defendant DPS is liable in *respondeat superior* for the actions and conduct of its employee.

36

185.   Defendant PUGH's conduct was and is a proximate cause of plaintiff's injuries, including his emotional, psychological, and physical injuries, and the permanent and serious impairment of plaintiff's academic and social development.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendants PUGH and DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT XII: M.C.L. §722.623 CLAIM AGAINST DEFENDANT BERRY GREER

186.   Plaintiff reincorporates each and every preceding paragraph as though more fully stated herein.

187.   Defendant GREER was an administrator in defendant DPS, and therefore is a member of the class of people for whom the obligations under M.C.L. §722.623 apply.

188.   Defendant GREER had reasonable cause to suspect child abuse due to his awareness of defendant PUGH's unprecedented access and control over the students at the FDAYM, without any form of supervision, monitoring, or control by himself or any other administrators at defendant DPS.

189.   Defendant GREER received information about defendant PUGH's abuse of plaintiff and yet failed to properly investigate the allegations and failed to report the alleged abuse to the appropriate authorities, which was clearly unreasonable in light of the known circumstances.

190.   Defendant GREER's failure to report the misconduct to the appropriate authorities violated M.C.L. §722.623, which required that defendant GREER report to appropriate authorities when he had reasonable cause to suspect abuse of plaintiff, which he clearly had.

191.   Defendant GREER's failure to report the abuse of plaintiff was a proximate cause of plaintiff's injuries and damages.

192.   Plaintiff does not concede that defendant GREER's failure to meet his obligations under M.C.L. §722.623 is shielded by any form of immunity protection. To the extent that it is found that immunity applies, defendant GREER is nonetheless liable for the misconduct because it constituted gross negligence and was the proximate cause of plaintiff's injuries and damages.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant GREER in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT XIII: M.C.L. §722.623 CLAIM AGAINST DEFENDANT MONIQUE MCMURTRY

193.   Plaintiff reincorporates each and every preceding paragraph as though more fully stated herein.

194.   Defendant MCMURTRY was an administrator in defendant DPS, and therefore is a member of the class of people for whom the obligations under M.C.L. §722.623 apply.

195.   Defendant MCMURTRY had reasonable cause to suspect child abuse due to her awareness of defendant PUGH's unprecedented access and control over the students at the FDAYM, without any form of supervision, monitoring, or control by himself or any other administrators at defendant DPS.

196.   Defendant MCMURTRY received information about defendant PUGH's abuse of plaintiff and yet failed to properly investigate the allegations and failed to report the alleged abuse to the appropriate authorities, which was clearly unreasonable in light of the known circumstances.

197.   Defendant MCMURTRY's failure to report the misconduct to the appropriate authorities violated M.C.L. §722.623, which required that defendant MCMURTRY report to appropriate authorities when she had reasonable cause to suspect abuse of plaintiff, which she clearly had.

198.   Defendant MCMURTRY's failure to report the abuse of plaintiff was a proximate cause of plaintiff's injuries and damages.

199.   Plaintiff does not concede that defendant MCMURTRY's failure to meet her obligations under M.C.L. §722.623 is shielded by any form of immunity protection. To the extent that it is found that immunity applies, MCMURTRY is nonetheless liable for the misconduct because it constituted gross negligence and was the proximate cause of plaintiff's injuries and damages.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant MCMURTRY in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT XIV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM AGAINST DEFENDANT CHARLES PUGH

200.   Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

201.   Defendant PUGH's conduct, as set forth above, was intentional, extreme, outrageous, and of such character as to be intolerable in a civilized society.

202.   Defendant PUGH's conduct was for an ulterior motive or purpose, including but not limited to causing plaintiff to suffer severe emotional distress.

203.   Defendant PUGH's conduct resulted in severe emotional distress to plaintiff.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant PUGH in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

## COUNT XV: TITLE IX GENDER HARASSMENT CLAIM AGAINST DEFENDANT DPS

204. Plaintiff reincorporates each and every preceding paragraph as though more fully restated herein.

205. At all times relevant to this action, defendant DPS was a recipient of federal funding.

206. Plaintiff was sexually harassed and abused over an extended period of time by defendant PUGH, and defendants each had actual and constructive knowledge of such harassment.

207. Defendants ROBERTS, BOBB, GREER, and MCMURTRY each learned of the abuse, and/or should have learned of the abuse, during the course and scope of their employment with defendant DPS.

208. Specifically, defendants GREER and MCMURTRY were present in the school during the times of the unprecedented access and control defendant PUGH exercised over the students, and failed to protect plaintiff from it.

209. Specifically, defendant ROBERTS overrode a school board decision of DPS prohibiting defendant PUGH from establishing the CPLF at the FDAYM,

and defendant ROBERTS continued to enforce this decision, thereby directly interfering with and directly depriving plaintiff of access to educational and social classroom benefits provided to other students.

210.   Plaintiff was a member of a protected class.

211.   Defendant DPS did not act properly to prevent such harassment from occurring, nor to stop such harassment from continuing once defendant PUGH had begun inappropriate contact with plaintiff

212.   The defendants failed to take appropriate action, in part, because of a *de facto* policy which had developed within defendant DPS, wherein incidents or alleged incidents of inappropriate sexual conduct involving students were not investigated or acted upon.

213.   The foregoing acts or omissions were in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*

214.   Defendant DPS, through its administrators and employees, had actual knowledge of the foregoing harassment, and was deliberately indifferent to that harassment.

215.   The harassment of plaintiff was severe, pervasive, objectively offensive, and deprived plaintiff of access to the educational opportunities and/or benefits he was entitled to.

216.   As a proximate result of the acts or omissions of defendant DPS and its employees, plaintiff suffered physical injuries, mental and emotional distress, pain, grief and anguish, medical expenses and the loss of earning capacity, all past, present, and future.

WHEREFORE, plaintiff seeks judgment of compensatory, punitive, and exemplary damages against defendant DPS in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, along with costs, interest, and attorney fees so wrongfully incurred.

Respectfully submitted,

SEIKALY & STEWART, P.C.
Attorneys for Plaintiff

By:  /s/ William R. Seikaly
WILLIAM R. SEIKALY (P33165)
CHOI T. PORTIS (P77123)
BENJAMIN J. WILENSKY (P75302)
30300 Northwestern Hwy., Ste. 200
Farmington Hills, Michigan 48334
(248) 785-0102

Dated: June 5, 2014

## DEMAND FOR TRIAL BY JURY

NOW COMES the Plaintiff, K.S., by and through his attorneys, SEIKALY & STEWART, P.C., and hereby demands a trial by jury in the above-entitled cause

of action.

Respectfully submitted,

S<small>EIKALY</small> & S<small>TEWART</small>, P.C.
Attorneys for Plaintiff

By:  /s/ William R. Seikaly
WILLIAM R. SEIKALY (P33165)
CHOI T. PORTIS (P77123)
BENJAMIN J. WILENSKY (P75302)
30300 Northwestern Hwy., Ste. 200
Farmington Hills, Michigan 48334
(248) 785-0102

Dated: June 5, 2014

44