UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K.S.,

      Plaintiff,       Case Number 14-12214

v.               Honorable David M. Lawson

DETROIT PUBLIC SCHOOLS,
CHARLES PUGH, ROY ROBERTS,
ROBERT BOBB, BERRY GREER,
and MONIQUE MCMURTRY,

      Defendants.

_____/

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION TO AMEND THE COMPLAINT AND GRANTING IN PART MOTION FOR JUDGMENT ON THE PLEADINGS

The plaintiff filed a complaint containing disturbing allegations of sexual misconduct by a former Detroit City Council member in his role as a volunteer teacher at a Detroit public school. The plaintiff — who is identified only by his initials, although he is over eighteen years old — alleges that defendant Charles Pugh made sexual advances toward him when he was a student at the Frederick Douglass Academy, culminating in repeated solicitations for the plaintiff to record a video of himself masturbating, for which Pugh paid him money. The plaintiff filed a complaint alleging various federal and state law claims against Pugh, the Detroit Public Schools, and its administrators. The defendants other than Pugh filed a motion for judgment on the pleadings, to which the plaintiff's response included a motion for leave to file an amended complaint. The defendants responded to the motion to amend, arguing that the amendment would be futile for most of the same reasons stated in their motion for judgment on the pleadings. The Court heard oral argument on the motions on April 23, 2015. The Court believes that the most efficient approach is to permit the amendment, and assess the amended complaint in light of the Detroit Public Schools defendants' motion for

judgment on the pleadings.  Having done so, the Court finds that the amended complaint fails to state a claim for which relief can be granted against the Detroit Public Schools defendants under 42 U.S.C. § 1983.  However, the plaintiff has alleged proper claims under the Michigan Elliott-Larsen Civil Rights Act and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(1). Therefore, the Court will grant in part and deny in part the motion for judgment on the pleadings.

## I.

According to the amended complaint, plaintiff K.S. is a former student of the Frederick Douglass Academy for Young Men, an all-boys school for grades 6 through 12 operated by defendant Detroit Public Schools.  Defendants Roy Roberts and Robert Bobb are former emergency managers of defendant DPS.  Defendants Berry Greer and Monique McMurtry are, respectively, the principal and assistant principal at the Douglass Academy.  Defendant Charles Pugh is the former president of the Detroit City Council, and the president of the "Charles Pugh Leadership Forum," which appears to have been Pugh's creation; it was a program of lectures and activities put on by Pugh for students at the Douglass Academy.

The nominal goal of the Charles Pugh Leadership Forum (CPLF) program was "to provide life and job skills for students in the program."  All seniors at the Douglass Academy were required by the school to attend the forum in order to graduate.  The plaintiff alleges that, through the program, "defendant Pugh was given unprecedented access and control over male students at [Douglass Academy], without any form of supervision, monitoring or control by DPS," and in particular he asserts that "no staff members at the [Academy] were present during CPLF sessions

for the purpose of supervision, despite the fact that . . . those sessions were a required part of the [Academy] curriculum, and were held at the [Academy]."

The amended complaint states that sometime before the fall of 2012, members of the DPS Board of Education were aware of defendant Pugh's "tendencies towards pedophilia and sexual abuse and harassment of school-aged boys," and "had discussed the matter on several occasions." Although the pleading alleges that one or more of the DPS school board members "informed Defendants Bobb and Roberts regarding these tendencies, and urged that Pugh not be permitted to be present in DPS school buildings, [and] that DPS [should not] host the CPLF program," the plaintiff offers no facts stating who was informed, what was said, or what specific conduct by Pugh constituted the prior sexual abuse or harassment. Bobb and Roberts allegedly ignored the concerns expressed by members of the school board, and "did nothing further to prevent Pugh's and CPLF's presence and participation in activities at DPS schools." Instead, the plaintiff alleges that defendant Bobb "overrode a school board decision of DPS prohibiting Pugh from establishing the CPLF at the [Douglass Academy]," and defendant Roberts "continued to enforce the decision put in place by defendant Bobb to allow the CPLF at the [Academy]." The plaintiff alleges that unspecified employees of defendant DPS "allowed defendant Pugh to place construction paper over the windows to the entry doors of the classroom in which the CPLF was held, allowing defendant Pugh to obscure events taking place within." He alleges that "no later than 2009 and continuing until 2011, defendant Greer was aware of the procedures regarding covering the classroom windows during the CPLF classroom sessions."

The plaintiff did not know Pugh and had never met him before the start of the Pugh Leadership Forum program, but he was aware that Pugh was president of the city council. The

-3-

amended complaint does not identify when the plaintiff first attended the forum program and met Pugh, but it implies that the plaintiff's attendance started some time during the 2012-13 school year. Soon after the program began, the plaintiff noticed Pugh giving him "extra attention" and "'groom[ing] him' in preparation for making sexual advances."   The plaintiff alleges that it was apparent to him that Pugh was interested in a sexual relationship with him, but he does not state when he came to that awareness.  He does state that his classmates teased him about the attention Pugh lavished on him, however.

Although the plaintiff does not allege that success at school or in Pugh's class was influenced by his response to Pugh's attention, he states:

> As part of the CPLF curriculum, Pugh urged plaintiff that it was crucial to work hard, and make money using whatever talents and means plaintiff had available to him, that were needed or desired by others, in order to transition into the adult world.

> At a time beginning no later than May 2013, defendant Pugh, as part of the grooming process, and purportedly as part of the CPLF program, began assisting plaintiff with obtaining a job.  Defendant Pugh, as part of the CPLF curriculum, told plaintiff that dress and appearance were crucial to succeed in a career, and specifically informed plaintiff that he would take him to purchase clothing for his "job interview[.]" Plaintiff indicated that he needed to get permission from his Mother.  Plaintiff used defendant Pugh's cell phone to call his Mother, who specifically did not give him permission to go with defendant Pugh.

Am. Compl. ¶¶ 26-29.  Notwithstanding that the plaintiff's mother had not given him permission to go clothes shopping with Pugh, Pugh told the plaintiff to meet him outside the school building at 2:00 p.m. on an unspecified date "no later than May 2013."  K.S. went outside at the appointed time, got into Pugh's car, and they rode together to the Men's Warehouse, K&G Men's Warehouse, and a Metro PCS store in Madison Heights.

During the shopping trip, Pugh learned that the plaintiff did not have a cell phone of his own, and that earlier text messages sent by Pugh to the plaintiff all had gone to the plaintiff's mother's

cell phone. The complaint does not suggest the specific content of any of those earlier messages, but the plaintiff alleges that his mother believed that the messages had come from "a girl that had a crush on plaintiff." Pugh took the plaintiff to Metro PCS, bought a cell phone, and gave it to the plaintiff, "so that Pugh could have contact with plaintiff without interference from plaintiff's mother."

While Pugh and the plaintiff were shopping for clothes "each time plaintiff tried on a pair of pants, defendant Pugh doted on the plaintiff by tucking in his pants and adjusting the clothes in a manner that made plaintiff very uncomfortable." After they finished shopping for clothes, "defendant Pugh stopped at CVS to withdraw money from an ATM," and "[w]hen defendant Pugh returned to the vehicle, [he] handed plaintiff Forty ($40.00) Dollars and, while smiling, put his hand on plaintiff's upper thigh." The plaintiff "removed defendant Pugh's hand from his thigh, but defendant Pugh laughed while staring at plaintiff."

On the evening of the same day that Pugh took the plaintiff clothes shopping and bought him a cell phone, Pugh "began text messaging plaintiff on a regular basis, aggressively pursuing plaintiff for a sexual relationship, and offering him money and gifts in exchange for sex or videos of the plaintiff performing sexual acts." On May 31, 2013, Pugh began "promising [the plaintiff] gifts, such as video games and money for performing sexual acts [or] making videos of plaintiff performing sexual acts." Pugh "made it clear to plaintiff that [Pugh's] career would be ruined if anyone found out about these bribes, and continuously told plaintiff to keep their conversations private." On June 1, 2013, the plaintiff told Pugh that he needed $160, and Pugh promised to pay him that amount for a video of the plaintiff masturbating. The plaintiff at first told Pugh that he did not feel comfortable making the video, but Pugh persisted in urging the plaintiff to make the video,

"preying upon plaintiff's emotions and twisting the lessons and curriculum taught to Plaintiff at the CPLF sessions Plaintiff was required [or] encouraged to attend at the [Douglass Academy]."  On June 2, 2013, the plaintiff recorded on an iPod given to him by Pugh a video of himself masturbating, and then gave the iPod to Pugh in exchange for $160.  On June 3, 2013, Pugh sent a text message to the plaintiff offering "to perform oral sex on the plaintiff in exchange for money."  Apparently no further contact between Pugh and the plaintiff occurred.

The plaintiff alleges that as a result of Pugh's "harassment and abuse" he "feels [] extreme shame, embarrassment, and emotional distress[,] lost the ability to trust others, and lost the desire to continue his education."  The plaintiff contends that as a result of the events, he "paid less attention during the 2012-2013 school year," and that he "had planned on attending college following his high school graduation, but because of Pugh's abuse and harassment, has been unable to do so."

Pugh concedes in other motion papers that he "is a gay man and paid money for a self-produced video of Plaintiff masturbating."  However, Pugh attempts to justify his conduct by pointing out that the plaintiff turned 18 years of age on February 9, 2013, a few months before he commenced his grooming activities.  He casts the entire series of events alleged in the amended complaint as nothing more than a consensual negotiation for sexual favors between two adult males — scandalous, perhaps, but not contrary to law.

The plaintiff alleges that "no later than June 2013, defendant McMurtry received an email from plaintiff's Mother regarding inappropriate contact between plaintiff and defendant Pugh," and that on an unspecified date "no later than May 2013," McMurtry told the plaintiff's mother that she was aware of "the events, and that plaintiff's Mother's 'parental concerns had not been forgotten.'"

-6-

The plaintiff filed his complaint on June 5, 2014, identifying himself by the pseudonym "K.S." On that same date, the plaintiff filed a motion for a protective order and for leave to file under seal an affidavit identifying the plaintiff by his legal name. The Court granted that motion and entered a protective order allowing the plaintiff to proceed under a pseudonym and barring the parties from disclosing his identity unless allowed by further order of the Court. On February 10, 2015, defendants Detroit Public Schools, Roy Roberts, Robert Bobb, Berry Greer, and Monique McMurtry ("the DPS defendants") filed their amended motion for judgment on the pleadings. Shortly thereafter, the plaintiff filed his motion to amend the complaint.

As to the DPS defendants, the plaintiff's proposed first amended complaint pleads eleven counts as follows. In the first group of counts, the plaintiff alleges that defendant Detroit Public Schools and its officials and administrators violated his rights under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment, contrary to 42 U.S.C. § 1983, by failing to acknowledge or prevent defendant Charles Pugh's sexual abuse of the plaintiff, and by following a tacit municipal policy sanctioning the abuse. The complaint pleads mostly materially identical claims against defendants Detroit Public Schools (count I), Robert Bobb (count II), and Roy Roberts (count III). Similarly the amended complaint pleads Due Process claims only against defendants Berry Greer (count IV) and Monique McMurtry (count V). In the second group, the plaintiff alleges that those same defendants violated the Michigan Elliott-Larsen Civil Rights Act (ELCRA) by subjecting the plaintiff to, or allowing him to be subjected to, sexual harassment and gender discrimination. The amended complaint pleads identical claims under ELCRA against defendant DPS and each of five named individual defendants: Roy Roberts (count VII); Robert Bobb (count VIII), Berry Greer (count IX), Monique McMurtry (count X), and Charles Pugh (count XI). Next,

the plaintiff pleads a claim of "gender harassment" under Title IX of the Education Amendments of 1972 against defendant DPS only (count XV).

In the remaining counts, the amended complaint separately pleads a federal constitutional claim against defendant Charles Pugh only, for violation of the Due Process Clause and 42 U.S.C. § 1983 (count VI), along with several state law claims for assault (count XII), battery (XIII), and intentional infliction of emotional distress (count XIV).

## II.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) applies the same standards that govern motions to dismiss. *See* Fed. R. Civ. P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001).

A defendant may test the legal sufficiency of a complaint by moving to dismiss under Rule 12(b)(6), by which the defendant implicitly concedes the truth of the pleaded facts for the purpose of the motion. *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiff, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiff. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "[A] judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations." *Saglioccolo v. Eagle Ins. Co.*, 112 F.3d 226, 228-29 (6th Cir. 1997) (quoting *Columbia Nat'l Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). "However, while liberal, this standard of review does require more than the bare assertion of legal conclusions." *Tatum*, 58 F.3d at 1109; *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 488

(6th Cir. 2009). "To survive a motion to dismiss, [a plaintiff] must plead 'enough factual matter' that, when taken as true, 'state[s] a claim to relief that is plausible on its face.' *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007). Plausibility requires showing more than the 'sheer possibility' of relief but less than a 'probab[le]' entitlement to relief. *Ashcroft v. Iqbal*, [556 U.S. 662, 678] (2009)." *Fabian v. Fulmer Helmets, Inc.*, 628 F.3d 278, 280 (6th Cir. 2010). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Under the new regime ushered in by *Twombly* and *Iqbal*, pleaded facts must be accepted by the reviewing court but conclusions should not be accepted unless they are plausibly supported by the pleaded facts. "[B]are assertions," such as those that "amount to nothing more than a 'formulaic recitation of the elements'" of a claim, can provide context to the factual allegations, but are insufficient to state a claim for relief and must be disregarded. *Iqbal*, 556 U.S. at 681 (quoting *Twombly*, 550 U.S. at 555). However, as long as a court can "'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss." *Fabian*, 628 F.3d at 281 (quoting *Iqbal*, 556 U.S. at 678).

Consideration of a motion to dismiss under Rule 12(b)(6) is confined to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). Assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). However, "documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing

-9-

Fed. R. Civ. P. 10(c)); *see also Koubriti v. Convertino*, 593 F.3d 459, 463 n.1 (6th Cir. 2010).  Even if a document is not attached to a complaint or answer, "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Commercial Money Ctr.*, 508 F.3d at 335-36.  If the plaintiff does not directly refer to a document in the pleadings, but that document governs the plaintiff's rights and is necessarily incorporated by reference, then the motion need not be converted to one for summary judgment.  *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997) (holding that plan documents could be considered without converting the motion to one for summary judgment even though the complaint referred only to the "plan" and not its associated documents).  In addition, "a court may consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Northville Downs v. Granholm*, 622 F.3d 579 (6th Cir. 2010) (citing *Commercial Money Ctr., Inc.*, 508 F.3d at 335-36).

In this case, the DPS defendants attached to their motion a log of the text messages that it appears the parties do not dispute were sent by defendant Pugh and the plaintiff to each other.  The DPS defendants make several extended arguments based on this text message log, attempting to establish that the alleged misconduct could not have occurred either before the plaintiff's eighteenth birthday or on any day when school was in session.  However, neither of those circumstances, even if true, is relevant to the analysis of the plaintiff's claims.  Moreover, it appears that the defendants believe that the Court should take "judicial notice" of the record of these text messages, because they were filed as an exhibit to the plaintiff's proof of claim in defendant Pugh's individual bankruptcy case.  Although it is well established that federal "courts can take notice of the actions of other courts," generally "a court will recognize only indisputable court actions, such as the entry

of a guilty plea or the dismissal of a civil action." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 468 (6th Cir. 2014) (citations and quotations omitted). Moreover, "a court cannot notice pleadings or testimony as true simply because these statements are filed with the court." *Ibid.* The defendants have not offered any good reason why the Court should consider the materials they rely upon that go beyond the pleadings, and they have not asked the Court to convert their motion for judgment on the pleadings to one for summary judgment under Rule 56. Therefore, the Court will disregard the text message log in reaching the decision on the motion for judgment on the pleadings.

### A.  State Action

Most of the plaintiff's federal claims are based on 42 U.S.C. § 1983. "To state a claim under [section] 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The defendants contend that the incidents alleged in the complaint comprise purely private conduct that occurred off school grounds, and that Pugh did not rely on any official status or authority in his pursuit of the plaintiff for sexual favors. The plaintiff responds that the alleged harassment and abuse are inherently related to the exercise of Pugh's authority as president of the Pugh Leadership Forum and a volunteer teacher at the Douglass Academy, because but for those circumstances of his office he never would have had the opportunity to meet the plaintiff and develop a relationship with him. The plaintiff argues that because he was required to attend the Pugh Leadership Forum, the eventual harassment and abuse that followed was facilitated by Pugh's official position and fairly attributable

to the actions (or inactions) of the school district and its administrators that required him to attend

Pugh's classes.

Individuals will be "considered state actors for the purposes of § 1983 only if their conduct

that allegedly gave rise to the deprivation of the [plaintiff's] constitutional rights may be 'fairly

attributable to the State.'"  *Marie v. Am. Red Cross*, 771 F.3d 344, 362 (6th Cir. 2014) (quoting

*Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982)).  As the Sixth Circuit has explained:

> In *Lugar*, the Supreme Court set forth a two-part test for determining whether the actions of a private party causing the deprivation of a federal right are attributable to the state.  First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible.  Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor.  This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state.

*Phelps v. Dunn*, 965 F.2d 93, 102 (6th Cir. 1992).  In *Phelps*, the court of appeals held that a

volunteer prison chaplain was a state actor, because the circumstances of the case showed that he

exercised state authority, was bound to apply prison policies, and acted "within the institutional

structure of chapel command."  *Ibid.*

There is no dispute that the DPS defendants are all state actors, and the individual DPS

defendants were acting under color of law.  Whether Pugh acted under color of law in seeking sexual

favors from the plaintiff, a DPS student, is a closer question.  Although the plaintiff notes that Pugh

is the former president of the Detroit City Council, he does not contend that Pugh's conduct qualifies

him as a state actor by virtue of his exercise of the power or authority of that office.  Instead, he

contends that Pugh's contact with him occurred solely through Pugh's role as a volunteer teacher

authorized to conduct a mandatory leadership class by the DPS.

-12-

According to the amended complaint, Pugh conducted leadership classes on the premises of the Douglass Academy, using school facilities, during school hours. DPS mandated the classes for all seniors as a condition of graduation. Pugh conducted the classes with the approval of the school board and the school administrators. It may be fairly inferred from these allegations that Pugh operated "within the institutional structure of [the DPS] command." The amended complaint contains allegations from which it could be found that the offending conduct was conducted "by a person for whom the [DPS] is responsible." The second part of the *Lugar* test can be satisfied by facts showing that Pugh "has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state." Here, the facts are somewhat congruent to those in *Phelps v. Dunn*, where the court of appeals held that a volunteer pastor was a state actor under 42 U.S.C. § 1983. The DPS furnished Pugh with a classroom and made his class a requirement for graduation at the Douglass Academy. Although he was a volunteer, in all other material respects, Pugh was a member of the faculty. His class met regularly, attendance was mandatory, and by dint of the DPS rules, his students in effect were a captive audience.

The plaintiff has pleaded sufficient facts to show that Pugh was acting under color of law within the meaning of section 1983.

### B. Substantive Due Process

In counts I though V of the amended complaint, the plaintiff charges that the various DPS defendants violated his rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. The due process component is based on an alleged deprivation of substantive due process. The DPS defendants argue that the substantive due process allegations fail as a matter of law because the specific conduct alleged — texting and a single incident where Pugh put his hand

-13-

on the plaintiff's thigh — fall far short of the "conscience shocking" sort of sexual and abusive invasion of bodily integrity required to make out a cognizable due process claim. The defendants point out that a plaintiff's due process claim on similar facts was rejected in *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir. 1996).

The plaintiff responds that "sexual abuse" of a student by a teacher is inherently "conscience shocking," and that the Sixth Circuit has recognized that such claims can anchor a plausible substantive due process claim. The plaintiff contends that *Lillard* upheld a judgment of liability for the defendant's conduct with another student plaintiff, where he "fondled her breasts and buttocks," and he points out that there was no indication in *Lillard* that the defendant "touched the plaintiff underneath her clothes." The plaintiff asserts that the allegations that Pugh touched his thigh "while handing him money" are sufficiently sexually suggestive to be similar to the claims that the Sixth Circuit allowed to proceed in *Lillard*.

The Sixth Circuit has held that "'a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee.'" *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 438 (6th Cir. 2002) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996)). Accordingly, "the Due Process Clause of the Fourteenth Amendment protects the right of a child to be free from sexual abuse inflicted by a public school teacher." *Ibid.* (citing *Claiborne County*, 103 F.3d at 506).

"Sexual abuse under color of law is so contrary to fundamental notions of liberty and so lacking of any redeeming social value, that no rational individual could believe that sexual abuse by a state actor is constitutionally permissible under the Due Process Clause," and "the right to be free from such abuse [is] clearly established." *Ibid.* (citing *Claiborne*, 103 F.3d at 507). However,

-14-

where the plaintiff proceeds on a theory of supervisory liability, he "'must show that, in light of the information the defendants possessed, the teacher who engaged in sexual abuse showed a strong likelihood that he would attempt to sexually abuse other students, such that the failure to take adequate precautions amounted to deliberate indifference to the constitutional rights of students.'" *Id.* at 439 (quoting *Claiborne County*, 103 F.3d at 513). "Put another way, . . . the plaintiff must show that the 'defendants' conduct amounted to a tacit authorization of the abuse.'" *Ibid.* That is because under Section 1983, a plaintiff must establish the liability of each individual defendant by that person's own conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). "When suing an individual actor [] for constitutional violations under § 1983, a plaintiff must demonstrate that the actor 'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). "To prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware." *Ibid.* (citing *Shehee*, 199 F.3d at 300; *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988)).

Here, the plaintiff has pleaded no facts sufficient to allege a violation of his substantive due process right to "bodily integrity." His only allegation of actual contact is the single incident in which defendant Pugh put his hand on the plaintiff's thigh. The plaintiff cites a number of the cases for the proposition that "sexual abuse" is *per se* an actionable violation of the Due Process Clause.

-15-

But he cites none in support of his argument that "adjusting the plaintiff's clothes" and touching the plaintiff's thigh while handing him money constitute "sexual abuse."

The plaintiff's reference to *Lillard* does not help him. There, the Sixth Circuit held that fondling a female student's breasts and buttocks constituted sexual abuse. But in that same case the court of appeals observed, as to allegations against the same teacher by another plaintiff, that:

> [Defendant teacher's] rubbing of [plaintiff student's] stomach, accompanied by a remark that could reasonably be interpreted as suggestive, was wholly inappropriate, and, if proved, should have serious disciplinary consequences for [the teacher]. But without more, it is not conduct that creates a constitutional claim. It is highly questionable whether a single, isolated incident of this magnitude could even rise to the level of sexual harassment under Title VII. *See Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). Under no circumstances, then, can it amount to "a brutal and inhumane abuse of . . . official power, literally shocking to the conscience," sufficient to state a claim for the violation of substantive due process rights. [*Webb v. McCullough*, 828 F.2d 1151, 1159 (6th Cir. 1987)].

*Lillard*, 76 F.3d at 726.

Because Pugh's conduct did not amount to a substantive due process violation, the DPS defendants cannot be held accountable for a constitutional deprivation as supervisors or by acquiescence. *Cf. Cartwright v. City of Marine City*, 336 F.3d 487, 495 (6th Cir. 2003) (holding that "[b]ecause the City can only be held liable if there is a showing of liability on the part of its officials, the determination that the officers did not violate [the plaintiff's] constitutional rights resolves plaintiff's claim against the City as well").

## C.  Equal Protection

The defendants argue that the plaintiff has failed to state a cognizable equal protection claim, because he has not pleaded that, as a male student, he was treated any differently than any similarly situated female student. The defendants contend that the plaintiff cannot do so because the Douglass Academy was an all-male school.

-16-

The plaintiff responds that his claims explicitly are premised on "gender-based class discrimination," which occurred when the defendants subjected male students, and not female students, to Pugh's harassing and abusive conduct, by allowing him to conduct the Pugh Leadership Forum program at an all-boys high school.  The plaintiff argues that gender-based discrimination is subject to "heightened scrutiny," and there cannot be any important or compelling reason that the defendants could have to justify such discrimination.

"The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws." *S.S. v. E. Kentucky Univ.*, 532 F.3d 445, 457 (6th Cir. 2008).  The Sixth Circuit has not ruled in a published decision on the precise question whether sexual harassment of a student by a teacher can support a claim for gender discrimination under 42 U.S.C. § 1983 and the Equal Protection Clause, although it has upheld sexual abuse claims brought on a substantive due process theory, as noted earlier.  However, the court of appeals' decisions on point suggest that sexual harassment is actionable on equal protection grounds, in appropriate circumstances.  For example, in *Hayes v. Vessey*, 777 F.2d 1149, 1153 (6th Cir. 1985), the court viewed the plaintiff's equal protection claim as "predicated on a theory that the defendants' failure to provide her with adequate security was the result, in part, of an intentional, discriminatory attitude towards her as a woman."  The court found that there was insufficient evidence to support a jury verdict of liability on an equal protection claim only because plaintiff did not show that the sole remaining defendant's conduct caused her to be raped by a prison inmate. *See also Mann v. Univ. of Cincinnati*, 114 F.3d 1188, 1997 WL 280188, at *2 (6th Cir. 1997) (unpublished table decision) ("[T]he record reveals that the jury had a sufficient basis to believe either plaintiff or Clemens.  It obviously concluded that Clemens had not created a 'discriminatorily

-17-

abusive . . . environment.'").  And the court stated in *Klemencic v. Ohio State Univ.*, 1997 WL 189502 (6th Cir. 1997) (unpublished table decision):

> It is undisputed [that] "sexual harassment by government employers would violate the rights protected by the equal protection clause."  *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) (citing *Huebschen v. Department of Health and Soc. Servs.*, 716 F.2d 1167, 1172 (7th Cir. 1983) ("sexual harassment . . . directed solely at the plaintiff because she was a woman" violates the equal protection clause)), *cert. denied*, 488 U.S. 1007 (1989). . . .  "[T]here is no doubt that the right to be free from sex discrimination is protected by the equal protection clause of the [F]ourteenth [A]mendment."  *Poe*, 853 F.2d at 432.

*Klemencic*, 1997 WL 189502, at *2.

The Seventh Circuit has held that "sexual abuse by a teacher can deprive a student of his or her right to equal protection under the law."  *T.E. v. Grindle*, 599 F.3d 583, 587 (7th Cir. 2010).  As the Seventh Circuit explained, alleged sexual abuse of a student by a teacher suffices to state a plausible claim under the Equal Protection Clause of the Fourteenth Amendment, and the plaintiff's claim will be sufficiently pleaded to defeat a school supervisor's qualified immunity defense where the student alleges that the supervisor knew about the abuse and deliberately covered it up.  The court held that the plaintiff need not "prove discriminatory intent [by showing that] male and female victims were treated differently."  599 F.3d at 588.  Instead it was enough to show that the teacher (a state actor) "denied the girls equal protection by molesting and abusing them."  *Ibid.*  The court based these conclusions on the premise "that the Equal Protection Clause does not require that the state actor be motivated solely by the plaintiff's membership in a protected class."  *Id.* at 589.  However, the court required the challenged decisions to have at least some component of class-based differentiation.  The court explained: "Even if [the principal] was motivated in part by a desire to avoid disciplining teachers in general, she could still be held liable if she treated the plaintiffs' claims differently because they were made by girls targeted for sexual abuse."  *Ibid.*

-18-

In this case, the plaintiff may have pleaded sufficient facts to allege plausibly that Pugh's conduct constituted unlawful sexual harassment and gender discrimination contrary to the Equal Protection Clause. *See Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988) ("sexual harassment by government employers would violate the rights protected by the equal protection clause"). But he has not pleaded sufficient facts to show that the other individually named defendants are liable for that discrimination. Pugh evidently does not dispute that he made repeated, explicit, insistent demands by text messaging for the plaintiff to perform sexual favors in exchange for money and other gifts. That conduct may constitute harassment of an explicitly sexual nature. But as to defendants Bobb, Roberts, Greer, and McMurtry, the plaintiff has not alleged any facts to show that they either failed or refused to respond to the plaintiff's or his mother's complaints because he was a male student, that his complaints of sexual harassment were mischaracterized or obfuscated, or that similar complaints by female students were treated differently. *Cf. T.E. v. Grindle*, 599 F.3d 583, 587 (7th Cir. 2010) ("a jury could conclude that by attempting to convert claims about sexual abuse by [the teacher] into complaints about teaching methods, [the principal] treated the girls' complaints differently because of their sex").

The plaintiff argues that he has alleged that DPS administrators were "aware of Pugh's persistent sexual harassment of students," and that they nevertheless allowed him to operate his program at the Douglass Academy and compelled the plaintiff to attend program sessions. The plaintiff argues that the school district's "policy" of ignoring complaints about Pugh's behavior was the "moving force" behind the plaintiff's injury, because "Pugh was able to abuse [the plaintiff] without fear of reprisal." However, the plaintiff has failed to plead sufficient facts to state a plausible claim that defendants Roberts, Bobb, Greer, or McMurtry are subject to supervisory

liability under 42 U.S.C. § 1983, because he has not alleged any facts sufficient to show that they "encourag[ed], implicitly authoriz[ed], approv[ed] or knowingly acquiesc[ed] in the misconduct." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)). The plaintiff has alleged, at most, that the individual defendants knew about the alleged incidents and did nothing. However, "[t]o prove acquiescence, it is not enough to show that the actor merely failed to act against misconduct of which he was aware." *Ibid.* (citing *Shehee*, 199 F.3d at 300; *Poe*, 853 F.2d at 429).

As to defendants Roberts and Bobb, the plaintiff has failed to plead any specific facts to show that they knew of specific past incidents of sexual harassment or misconduct by Pugh against other students, other than in the undeveloped and vague allegations that members of the school board had "informed" Roberts and Bobb of Pugh's "tendencies towards pedophilia and sexual abuse and harassment of school-aged boys." The plaintiff does not allege that anyone discussed with any of the named defendants any actual incidents of "pedophilia" or "sexual abuse and harassment of school-aged boys," other than when the plaintiff's mother contacted McMurtry. And as to that contact, the complaint does not allege that the plaintiff's mother discussed anything with McMurtry other than her concerns about Pugh's contact with the plaintiff himself. As to Roberts and Bobb, the plaintiff alleges that "there was a clear and persistent pattern of abuse, and despite the fact that [the defendants] had actual knowledge that plaintiff could not protect himself from defendant Pugh's sexual misconduct, [they were] deliberately indifferent to known facts which demonstrated an unreasonable risk to plaintiff's safety such that [the defendants] tacitly approved, condoned, tolerated, [or] acquiesced in the deprivation of plaintiff's constitutional rights." Am. Compl. ¶¶ 86, 107. But he does not recite any "known facts" to illustrate the existence of any "pattern" of abuse,

-20-

other than the sparse allegations of text messaging "harassment" and one incident of touching that occurred sometime during May and June 2013. That, however, is not enough to show encouragement, approval, or implicit authorization.

As to defendants Greer and McMurtry, the plaintiff alleges nothing more than that those defendants "failed to monitor" Pugh's conduct, did not conduct a background check on him before allowing the Pugh Leadership Forum program to be conducted at the school, and failed to ensure "that a certified teacher was present while students were receiving instruction," and that they "became aware of the inappropriate contact defendant Pugh had with plaintiff," but "failed to take corrective action to prevent defendant Pugh's conduct." The plaintiff alleges that McMurtry received an email from the plaintiff's mother in June 2013 and had some other contact during May 2013, in which she reassured plaintiff's mother that her "parental concerns" were not forgotten. But he alleges nothing in the way of facts to show that McMurtry or Greer did anything other than failing to respond to the complaints after becoming aware of them.

The amended complaint fails to state a section 1983 claim against the individual DPS defendants based on the Equal Protection Clause.

### D. Title IX

The defendants argue that the plaintiff has failed to allege an actionable claim under Title IX because (1) the alleged "abuse" by defendant Pugh falls far short of the severe, pervasive, and egregious conduct over long spans of time that has been found actionable in Title IX cases; (2) there are no allegations that defendants Roberts, Bobb, or Greer received "actual notice" of the alleged abuse; (3) the plaintiff's vague allegation that defendant McMurtry received notice at an unspecified date "no later than May 2013" makes it impossible to evaluate the reasonableness of any response

she might have made at any particular time; (4) the plaintiff has not established that the misconduct occurred in a setting under the control of any named defendant, because all the alleged incidents took place off school grounds and outside school hours; and (5) the record of text messaging between Pugh and the plaintiff plainly shows that the negotiation for sexual favors was consensual and not at all "unwelcome." For these last two points, the defendants again rely substantially on their analysis of the message log exhibits, which the Court disregards.

The plaintiff responds that he has alleged harassment that was "severe" and "pervasive," because he alleges "that Pugh's harassment began early in the 2012 school year," when Pugh "looked at him in a sexually suggestive way," which the plaintiff's classmates noticed and teased him about. The plaintiff contends that the harassment escalated later in the year when Pugh touched the plaintiff while clothes shopping and while sitting in his car, and then persistently urged the plaintiff to make sexual movies for him in exchange for money and gifts. The plaintiff contends that the fact that misconduct occurred off school grounds is not dispositive of the plaintiff's claims, and the implication that the plaintiff "consented" to the abuse is simply a red herring and irrelevant to the Title IX analysis. The plaintiff further argues that he plainly alleges actual notice of the misconduct and deliberate indifference in his amended complaint, based on affidavit testimony by two DPS school board members, in which they state that they informed defendants Roberts and Bobb of Pugh's "tendency" toward "pedophilia," and the allegations that those defendants overrode a decision by the school board barring Pugh from conducting his program at the Douglass Academy.

Title IX of the Education Amendments of 1972 "provides that 'No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'"

*Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (quoting 20 U.S.C. § 1681(a)). "This includes the duty not to discriminate on the basis of sex, which encompasses a teacher's sexual harassment of a student." *Ibid.* (citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 282 (1998)). "In *Gebser*, which involved the harassment of a student by a teacher, it was established by the Supreme Court that a school district can be held liable in damages for the sexual harassment if it is proven that the school district had actual notice and exhibited deliberate indifference to the alleged harassment." *Ibid.* (citing *Gebser*, 524 U.S. at 292). "*Gebser* explained that deliberate indifference of a school district is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of the abuse, and fails adequately to respond." *Ibid.* (quotation marks and citations omitted).

However, school officials may be "deemed 'deliberately indifferent' to acts of [] harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). Although *Davis* concerned "student-on-student" harassment, the Sixth Circuit has held that the same "deliberate indifference" standard announced by the Supreme Court in that case also applies to teacher-on-student cases. *Williams*, 400 F.3d at 367 ("It is clear from a reading of *Gebser* and *Davis*, that the Court is discussing only one standard for 'deliberate indifference' in Title IX pupil harassment cases and not, as [the plaintiff] contends, one standard for student-on-student harassment and a less stringent standard for teacher-on-student harassment.").

The plaintiff has pleaded sufficient facts plausibly to allege that the responses of defendants Roberts, Bobb, Greer, and McMurtry were "clearly unreasonable in light of the known circumstances" before the alleged events of May and June 2013, such that their responses constituted

"deliberate indifference" to the plaintiff's complaints. The Supreme Court explained in *Gebser v. Lago Vista Independent School District*, 524 U.S. 274 (1998), that "deliberate indifference of a school district is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of the abuse, and fails adequately to respond." *Id.* at 292 (quotations and citations omitted). School officials may be "deemed 'deliberately indifferent' to acts of [] harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). Here, the plaintiff has alleged that the defendants were informed by school board members in the fall of 2012 that Pugh had tendencies toward pedophilia, sexual abuse, and harassment of school-aged boys. The plaintiff alleged in the amended complaint that despite this knowledge, they did nothing.

In this day and age, warnings that a teacher is prone to inappropriate attractions to students should have set off alarm bells. Instead, both emergency managers and the Douglass Academy administrators allowed Pugh unfettered access to male students. They did not investigate the allegations, or so much as perform a background check. They mandated participation in his leadership class, and they allowed him to block the windows to his classroom so as to prevent onlookers from observing him in class. And as it turned out, smoke portended fire.

The conduct of the administrators, charged with the care and education of young men, is baffling. And the safety of the students aside, the emergency managers, charged with running a school district in financial distress, should have been sensitive to the potential impact of an adverse judgment that Pugh's conduct might provoke.

-24-

The Court is satisfied that the plaintiff has pleaded facts in the amended complaint from which a jury could find that the DPS defendants' response to fair warnings about Charles Pugh's exposure to students was plainly unreasonable, and they were deliberately indifferent to potential harm.

### E.  State Law Claims

The plaintiff has included counts under Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, which prohibits any educational institution from "[d]iscriminat[ing] against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." Mich. Comp. Laws § 37.2402(a).  The Act defines the term "educational institution" to "mean[] a public or private institution, or a separate school or department thereof," including any "academy, college, elementary or secondary school, [or] local school system," as well as any "agent of an educational institution."  Mich. Comp. Laws § 37.2401.  "Discrimination because of sex includes sexual harassment."  Mich. Comp. Laws § 37.2103(*i*).  The definition of sexual harassment includes "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's . . . education, . . . or creating an intimidating, hostile, or offensive . . . educational . . . environment."  *Ibid.*

The defendants argue that the plaintiff cannot establish that the sexual communications and conduct Pugh engaged in were "unwelcome," because the plaintiff's text messages show that he welcomed or at least consented to Pugh's advances.  The defendants argue, moreover, that the plaintiff has failed to show how a handful of isolated incidents of conduct over the course of a single

weekend, that took place off school grounds and after school hours, in any way "permeated" the school environment or substantially interfered with the plaintiff's education.

The plaintiff responds that he has alleged his Elliott-Larsen claims adequately, based on the same facts discussed above in relation to his due process, equal protection, and Title IX deliberate indifference claims. The plaintiff argues that he has established that the alleged harassment substantially interfered with his education, based on his allegations that he "lost interest" in his education, "paid less attention" during the remainder of the school year after the harassment, has found it difficult to hold a job or trust anyone, and ultimately abandoned his plans to attend university or community college as a result of his feelings about the events.

The elements of a *quid pro quo* sexual harassment claim are "(1) that [the plaintiff] was subjected to any of the types of unwelcome sexual conduct or communication described in the statute and (2) that the public service provider or the public service provider's agent made submission to the proscribed conduct a term or condition of obtaining public services or used the plaintiff's submission to or rejection of the proscribed conduct as a factor in a decision affecting his or her receipt of public services." *Hamed v. Wayne County*, 490 Mich. 1, 10, 803 N.W.2d 237, 244 (2011).

In order to establish a *prima facie* case under the hostile environment theory, the plaintiff must allege that: (1) he belonged to a protected group; (2) he was subjected to communication or conduct on the basis of sex; (3) he was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the student's access to education or created an intimidating, hostile, or offensive educational environment; and (5) *respondeat superior*. *Radtke v. Everett*, 442 Mich. 368, 382-83,

501 N.W.2d 155, 162 (1993) (citing Mich. Comp. Laws §§ 37.2103(h), 37.2202(1)(a)).  The first element will be satisfied where the plaintiff shows that he is a student "who has been the object of unwelcomed sexual advances," since "all [students] are inherently members of a protected class in hostile [] environment cases because all persons may be discriminated against on the basis of sex." *Id.* at 383, 501 N.W.2d at 162.  The second element likewise will be satisfied where the plaintiff "alleges that [he] was subjected to harassment on the basis of sex."  *Ibid.*

Pugh's alleged persistent demands for sexual favors certainly suffice to constitute "unwelcome sexual advances, requests for sexual favors, [or] other verbal or physical conduct or communication of a sexual nature."  Mich. Comp. Laws § 37.2103(*i*).  The DPS defendants' argument that the advances were welcome requires a factual evaluation, and relies on materials that are beyond consideration in the present motion.

There may be some question whether the plaintiff can show that submission to the conduct or communication was made a term or condition of his obtaining education; that submission to or rejection of the conduct or communication was  used as a factor in decisions affecting his education; or that the conduct or communication had the effect of substantially interfering with his education or "creat[ed] an intimidating, hostile, or offensive [educational] environment."  *Ibid.*  However, the plaintiff has alleged that he "paid less attention during the 2012-2013 school year," and that he "had planned on attending college following his high school graduation, but because of Pugh's abuse and harassment, has been unable to do so."  Because Pugh's class was a graduation requirement, and the plaintiff has alleged that Pugh emphasized that the attention he paid to the plaintiff was geared to directing him toward success in life, those allegations are sufficient to satisfy this element of the hostile work environment form of sexual harassment.

The DPS defendants also argue that the plaintiff failed to allege the *respondeat superior* element of a sexual harassment claim.  In their brief, they delve into an hour-by-hour analysis of the text messaging logs in an attempt to establish that the plaintiff cannot show that any of the individual defendants knew of the alleged misconduct and failed to prevent it, since the logs establish that the specific incidents alleged first began on the evening of May 31, 2013 (a Friday), and that they ended on June 3, 2013 (Monday), one day before the plaintiff's mother asserts that she discovered and reported Pugh's inappropriate contact with her son to defendant McMurtry.  The defendants argue that it is not alleged that any of them knew anything about the misconduct before June 4, 2013, and there was nothing that they could have done about it over the previous weekend.

Under Michigan law, "[w]hen the harassment was committed by an agent and the plaintiff is pursuing a civil rights claim against the principal . . . a court must [] determine the extent of the employer's vicarious liability." *Radtke*, 442 Mich. at 382-83, 501 N.W.2d at 162 (quotation marks omitted).  "Thus, if a defendant is not vicariously liable for the acts of its agent under traditional principles of respondeat superior, the plaintiff's claim under [ELCRA] fails as a matter of law." *Ibid.*  The general rule is that an employer is responsible for his employee's conduct performed within the scope of the employment engagement.  *Zsigo v. Hurley Med. Ctr.*, 475 Mich. 215, 221 716 N.W.2d 220, 223 (2006).  The Michigan courts define "'within the scope of employment' to mean 'engaged in the service of his master, or while about his master's business.'" *Hamed*, 490 Mich. at 11, 803 N.W.2d at 244 (footnote omitted).  Aside from that general rule, however, "an employer can be held liable for its employee's conduct if the employer knew or should have known of the employee's propensities . . . before that employee committed an intentional tort." *Id.* at 12,

-28-

803 N.W.2d at 245 (footnote omitted).  This foreseeability question, the Michigan Supreme Court
has explained,

> involves an analysis of whether an employer had (1) actual or constructive
> knowledge of prior similar conduct and (2) actual or constructive knowledge of the
> employee's propensity to act in accordance with that conduct.

*Ibid.*

The amended complaint does not allege specific facts to show that Pugh engaged in any past
relevant instances of similar conduct.  However, that form of specificity is not fatal to the case at the
pleading stage, where the plaintiff alleges that the defendants were told specifically of Pugh's
tendency toward pedophilia and harassment of young boys.

 The plaintiff has stated a proper claim under Michigan's Elliott-Larsen Civil Rights Act.

III.

The Court has analyzed the DPS defendants' motion for judgment on the pleadings as
applied to the amended complaint.  That is appropriate, since the defendants' only objection to the
amendment is based on futility.  They argue that the proposed amended complaint is insufficient for
the same reasons that they contend they are entitled to judgment as a matter of law on the claims in
the original complaint.  And to the extent that the Court has granted in part the motion for judgment
on the pleadings, the defendants largely are correct.  A court may deny a motion for leave to amend
when the proposed amendment would be futile.  *Head v. Jellico Housing Auth.*, 870 F.2d 1117, 1123
(6th Cir. 1989); *Martin v. Associated Truck Lines, Inc.*, 801 F.2d 246, 248 (6th Cir. 1986);
*Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir. 1980).
However, because some of the counts survive that motion, and the proposed amended complaint
dispenses with the claims in the original complaint under the Michigan Child Protection Act, which

otherwise have not formally been dismissed and which the parties have not litigated, the Court finds the amendment is proper. Rule 15(a)(2) provides that "[t]he court should freely give leave when justice so requires." The motion to amend the complaint will be granted.

<div align="center">IV.</div>

For the reasons state above, the plaintiff has not stated claims in his proposed amended complaint against the Detroit Public Schools defendants for which relief can be granted under 42 U.S.C. § 1983. He has stated valid claims against those defendants under Title IX and the Michigan Elliott-Larsen Civil Rights Act. The motion to amend the complaint is meritorious.

Accordingly, it is **ORDERED** that the plaintiff's motion for leave to amend the complaint [dkt. #56] is **GRANTED**. The proposed amended complaint attached as Exhibit 1 to the plaintiff's motion is **DEEMED FILED**.

It is further **ORDERED** that the motion by the Detroit Public Schools defendants for judgment on the pleadings [dkt. #31] is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that counts I, II, III, IV, and V of the amended complaint are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** in all other respects.

<div style="margin-left: 40%;">

s/David M. Lawson

DAVID M. LAWSON

United States District Judge

</div>

Dated:  July 21, 2015

<div align="center">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 21, 2015.

s/Susan Pinkowski

SUSAN PINKOWSKI

</div>