UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

K.S.,

                         Plaintiff,                                Case Number 14-12214

v.                                                       Honorable David M. Lawson

DETROIT PUBLIC SCHOOLS,
CHARLES PUGH, ROY ROBERTS,
ROBERT BOBB, BERRY GREER,
and MONIQUE MCMURTRY,

                          Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CHARLES PUGH'S MOTION FOR SUMMARY JUDGMENT, AND DENYING DPS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on the motions for summary judgment separately filed by defendant Charles Pugh and by defendants Detroit Public Schools, Roy Roberts, Robert Bobb, Berry Greer, and Monique McMurtry (the DPS defendants). The plaintiff alleges in an amended complaint that former Detroit City Council member and president Charles Pugh, while acting as a volunteer teacher, made sexual advances toward him when he was a student at the Frederick Douglass Academy, culminating in repeated solicitations for the plaintiff to record a video of himself masturbating, for which Pugh paid him money. The Court dismissed certain claims after the DPS defendants filed a motion for judgment on the pleadings. The remaining claims are based on the Michigan Elliott-Larsen Civil Rights Act, Title IX of the Educations Amendments of 1972, and Michigan common law.

Pugh argues in his motion that there can be no civil rights violation because the plaintiff is not a member of a protected group, his conduct was not "unwelcome," and he could not have interfered with the plaintiff's education because Pugh's advances all occurred after the last day of

classes. He also says his conduct could not have provoked the outrage necessary to support a claim for intentional infliction of emotional distress. The DPS defendants echo Pugh's argument that the conduct occurred only after the end of the school year. They also contend that they had no advance notice of Pugh's conduct, so they could not have prevented it. The defendants seek dismissal of all counts of the amended complaint.

The Court heard oral argument from the parties on August 24, 2015, and now concludes that defendant Pugh is entitled only to dismissal of count VI of the amended complaint, which alleges that certain touching violated the plaintiff's right to bodily integrity — a substantive due process violation. However, the plaintiff has come forth with evidence that creates a genuine factual dispute on the other claims. Therefore, Pugh's motion for summary judgment will be denied in all other respects, and the DPS defendants' motion for summary judgment will be denied in full.

I.

Plaintiff K.S. (a pseudonym) is a former student of the Frederick Douglass Academy for Young Men, an all-boys school for grades 6 through 12 operated by defendant Detroit Public Schools. Defendants Roy Roberts and Robert Bobb are former emergency managers of defendant DPS. Defendants Berry Greer and Monique McMurtry are, respectively, the principal and assistant principal at the Douglass Academy. Defendant Charles Pugh is the former president of the Detroit City Council, and the president of the "Charles Pugh Leadership Forum," an entity of Pugh's creation, which was a program of lectures and activities put on by Pugh for students at the Douglass Academy. The nominal goal of the Charles Pugh Leadership Forum program was "to provide life and job skills for students in the program."

-2-

## A. Pugh Leadership Forum Program

After discussing his program with school officials, Pugh began conducting the program at the Douglass Academy in January 2011.  Douglass Academy Principal Berry Greer testified that he never evaluated Pugh's leadership program and only dropped in during program meetings — that is, the classes when students were present with Pugh — once or twice for around five minutes. Greer had one meeting with Pugh before the program started to "get acquainted."  No one from the school was assigned to be present during the leadership forum meetings, and Greer agreed that it was "unusual to have a classroom of students with no teacher in it."

Douglass Academy Assistant Principal Monique McMurtry testified that she knew that the school had an obligation to protect students from sexual harassment and to monitor activity by adults present in the school with students.  Principal Greer testified that he also understood that the school had such obligations.  Greer testified that he did not have any knowledge that anyone ever conducted a background check on Pugh before allowing him to conduct his leadership forum program at the school.  McMurtry admitted that she did not conduct any background checks on any of the persons coming into the school to conduct the Pugh Leadership Forum meetings, and that neither she nor anyone she knew kept track of who came and went from the program meetings.

Angela Montgomery was a DPS employee responsible for ensuring that outside persons and organizations who volunteer to provide programs or services at DPS schools are aware of and abide by appropriate school policies.  Sample agreements used by Ms. Montgomery (which program volunteers might be required to sign as a condition of working with a school) state that all persons involved with the program would be required to "[a]bide by all DPS policies, rules, [and] regulations, including but not limited to having all mentors submit to fingerprinting and a

background check."  Montgomery testified that district and school policies would require that all volunteers must be supervised by school staff while working in the school, and that they should be instructed to ensure they understood the school policies that they must comply with.  Ordinarily, volunteers would be expected to be monitored regularly by someone while in the school so that school officials would be aware of what volunteers were doing with students during their programs. Montgomery testified that as a routine part of screening, volunteers could required to submit to criminal history checks and background checks to reveal any convictions for sexual misconduct.

### B. Plaintiff's Encounters With Pugh

Plaintiff K.S. attended weekly meetings of the Pugh Leadership Forum program at the Douglass Academy, during the lunch hour, every Wednesday throughout the school year.   The program ran from the beginning of the school year in September 2012 through the end of the school year in June 2013.

K.S. testified that he looked up to Pugh as a powerful individual because of his position as the president of the Detroit City Council, and he was hopeful that Pugh could help him with his career, because Pugh told K.S. that he was interested in helping the plaintiff get into college, save money, and get a job.  Pugh told the students at the forum sessions that they needed to "learn what they got and they can use to get money," and "when you find out what it is [to] use it."

From the first meetings of the forum at the start of the school year, K.S. noticed Pugh giving him "seductive look[s]."  The plaintiff noticed Pugh giving him such looks "regularly" throughout his attendance at the forum meetings.  K.S. had never seen a man look at him in the way that Pugh did, but he had received and recognized similar looks from girls many times.  K.S. perceived that Pugh was flirting with him in the same way that he was accustomed to girls flirting with him.  Other

-4-

students at the Douglass Academy talked about how Pugh acted toward K.S. during the leadership forum meetings, and, as a result of Pugh's behavior toward the plaintiff, rumors were spread that K.S. was gay.

In October 2012, K.S.'s mother began receiving text messages on her cell phone of a sexual nature, but she assumed they were messages to K.S. from a girl, and she deleted them.  Although K.S. used his mother's phone during the day, his mother used it at night.  She determined later that the messages had come from Pugh, because when Pugh began persistently calling her in June 2013, she blocked his number on her phone; when she did that she noticed old text messages from the same number from February 2013, and she recalled the same number being the one from which the sexual messages were received in late 2012.  At the time the messages were received, K.S.'s mother did not show them to her son and she instead erased them, but the next morning she told K.S. to tell his friends to stop texting him at her number late at night.

On May 31, 2013, at the last meeting of the leadership forum, Pugh arranged a pizza party for students at the Academy.  During the party, K.S. told Pugh that he was not planning to go to a job interview that he had been offered because he did not have appropriate clothes to wear.  Pugh told K.S. that he would take him shopping and buy him some clothes for the interview.  K.S. said that he would need to ask his mother, and Pugh called her on his own phone.  K.S.'s mother testified that when he called her and said he wanted to take K.S. shopping, she told Pugh that he was not allowed to take her son shopping and that all K.S. needed to do was come home and change clothes for the interview.  After he ended the call, Pugh told K.S. that he would pick him up at 2:40 outside the school for their shopping trip.

-5-

When the plaintiff met Pugh outside at the appointed time and got in his car, Pugh commented that he had tried to call K.S., and K.S. told him that his phone only worked when it had Wi-Fi access.  Pugh told K.S. that he would buy him a phone, and then drove to a MetroPCS store where Pugh bought a phone and gave it to K.S.

After they left the MetroPCS store, Pugh took the plaintiff shopping for clothes at a K&G Men's Warehouse store.  The plaintiff testified that, when he came out of the dressing room with pants on that he was trying, Pugh "took his fingers and put them inside my pants and kept fixing my pants around me."  K.S. was bothered by Pugh's touching, and he stated that he "[g]rabbed the pants myself and started trying to fix them, and [Pugh] stopped."  The plaintiff went into the dressing room to put on a second pair of pants, and when he came back out, Pugh again put his hands in the plaintiff's waistband to "fix" his pants.

After they were finished shopping for clothes, Pugh drove to a CVS store with the plaintiff, and Pugh went inside.  Pugh and K.S. were in Pugh's car after Pugh left the CVS store, and Pugh held out $40, offering it to the plaintiff.  When K.S. reached out and took the money, Pugh dropped his hand onto the plaintiff's upper thigh and left it there.  Pugh's hand was on K.S.'s upper thigh for about three or four seconds, and Pugh was smiling when the plaintiff looked at him.  K.S. then moved Pugh's hand off of his thigh, and Pugh laughed.  After Pugh touched his thigh and the plaintiff removed his hand, the plaintiff "[did not] want to look at [Pugh] anymore" as Pugh drove the plaintiff home.

Later, after Pugh left the plaintiff, he began sending what can only fairly be described as a barrage of sexually explicit text messages that culminated in torrid exhortations by Pugh for the plaintiff to make a video of himself masturbating in exchange for money.  Pugh continued to send

-6-

what eventually amounted to hundreds of similar sexually explicit messages over the next several days. Pugh does not deny sending the messages, and in particular he admitted suggesting that if the plaintiff "made sex tapes [Pugh] would pay him money." Pugh also admits that he sent messages to K.S. stating that Pugh had a "crush" on the plaintiff.

After Pugh asked the plaintiff to make the sexually explicit video, he gave K.S. an iPhone to record it. The plaintiff procrastinated about making the video, but after Pugh repeatedly asked for it, the plaintiff finally relented and agreed, because he needed money to pay for a hotel room to stay in after the prom. On June 1, 2013, K.S. sent Pugh a text message stating that he needed $160, and Pugh replied that if K.S. wanted the money he would have to make the video. Pugh later texted the plaintiff asking when he planned to make the video, telling the plaintiff that Pugh would prefer if he was alone in the video, and telling him to make sure the lighting was good and that the video showed the plaintiff ejaculating.

As a result of Pugh's conduct toward him, the plaintiff says he "lost all [his] friends." K.S. also testified that, because of the rumors that he was gay, "[his] family disowned [him]." After the incidents with Pugh, the plaintiff had problems focusing on school, and would sometimes find himself distracted and unaware of what he was doing.

### C. Reports of Inappropriate Conduct by Pugh

Assistant Principal McMurtry acknowledged that on June 3, 2013, K.S.'s mother called and told her that she was concerned that Pugh had given her son gifts of clothing and a cell phone without asking her permission first. K.S.'s mother testified that she had not spoken to anyone at the school about her concerns with Pugh and her son before she talked to McMurtry. McMurtry offered to set up a meeting with K.S., his mother, and Pugh, so that K.S. could return the items. McMurtry

-7-

informed Principal Greer of the complaint, but Greer delegated to her the responsibility of following up on it, and he took no action. Greer agreed that it would have been appropriate to investigate such a complaint by speaking to other students who had attended the leadership forum meetings, but he never did so, and he was not aware that McMurtry ever did so either. K.S.'s mother called McMurtry again on June 4, 2013 to discuss her concerns, and McMurtry told her "well, we thought about this and I pondered but we [don't] want a lawsuit." K.S.'s mother never reported to McMurtry that Pugh had been sending her son text messages of a sexual nature. K.S.'s mother did not learn that Pugh had put his hand on K.S.'s thigh until June 29, 2013, and when her son told her about the touching, she filed a report of the incident that same day with the Madison Heights Police Department.

McMurtry testified that if she knew Pugh had sent text messages to a student stating such things as that he "had been waiting to see K.S. nude all year," then she would have viewed that as inappropriate conduct toward a student and would have "significantly increase[d]" monitoring of Pugh while he was around students. McMurtry also understood that school policies required that any school official with knowledge of inappropriate conduct by an adult toward a student was obligated to report the contact to Child Protective Services, regardless of the age of the student. Greer testified that he had read some of the text messages sent by Pugh to K.S. and that they were "wholly inappropriate." McMurtry also testified that it would have been against school policy for an adult to arrive at school in the middle of the school day and leave with a student, unless the student first spoke to his guidance counselor, so that the counselor could call the student's parent and confirm that permission was given for the student to leave school with the adult in question.

-8-

Helen Moore testified that she was an active member of the Parent Teacher Association at the Douglass Academy and attended many of its meetings.  She was present at more than one meeting when parents "discussed concerns about Mr. Pugh's mentorship program because he was known to have inappropriate relationship with teenaged boys."  Moore stated that Carolyn Miller-Bell, the Douglass Academy secretary who worked for the former principal of the school (Greer's predecessor), "was present during and participated in conversations regarding Mr. Pugh's history with teenaged boys and the inappropriateness of having him run the mentorship program."

Ida Short was a member of the School Board of the Detroit Public Schools in 2011, when she heard that Pugh was going to be conducting a mentorship program at the Douglass Academy. When Pugh made a public announcement about the program, members of the board expressed concerned because Ms. Short's fellow board members Lamar Lemmons and Tawanna Simpson "were aware that Mr. Pugh was known to keep company with very young, often underage boys (teenagers)."  The members of the board were "concerned about this because Mr. Pugh was thought to date underage teenaged boys," and they "made sure the emergency managers — Roy Roberts and Robert Bobb — were aware of [their] concerns and the reasons behind them."  The board members thought the mentorship program should not be allowed to proceed as planned and would be better placed at another facility, particularly an all-girls school.

Tawanna Simpson also was a member of the school board starting in 2012.  From the start of her tenure, she was aware of the board's concerns about Pugh's program.  Simpson was aware that Mr. Lemmons talked to Roy Roberts about the board's concerns and told him "that the placement of Mr. Pugh at a boy's school was dangerous."  Ms. Simpson was particularly concerned because she personally had seen Pugh in public on a date with a very young boy.  Simpson testified:

I was at a Christmas Concert featuring Al Jareau in 2009, in the box seats[,] when I saw Mr. Pugh with a very young man. I asked the boy how old he was and he said he was 15-16 years old. The boy said his boyfriend, Charles Pugh, bought the tickets for them. I told the board about what I had seen because it confirmed the community perception [of Pugh's reputation for dating young boys].

As a board, we discussed this issue several times. We wanted to have Mr. Pugh removed from Frederick Douglas[s] [Academy] and have his program at a girls' school.

Elena Herrada also was a member of the school board. During the first year after Roy Roberts took over as emergency manager of the school district, she attended a number of informal meetings with Mr. Roberts, at his invitation, in Roberts's office. Herrada was present during a meeting attended by Roberts and her fellow board member Lamar Lemmons. At that meeting, Lemmons told Roberts that Pugh should not be allowed to conduct his mentorship program at the Douglass Academy, because he had a history of inappropriate relationships with young boys.

### D. Procedural History

On July 21, 2015, the Court filed an opinion and order granting the plaintiff's motion for leave to file a first amended complaint, granting in part the DPS defendants' motion for judgment on the pleadings, and dismissing counts I through V of the amended complaint, which raised claims against the DPS defendants under 42 U.S.C. § 1983. In the surviving counts of the complaint, the plaintiff raised claims against the DPS defendants under Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and against defendant Charles Pugh individually under 42 U.S.C. § 1983 and various state law causes of action.

In Counts VII through X, the amended complaint raises claims under Elliott-Larsen against defendant DPS and the four named defendants who are present or former school officials: Roy

Roberts (Count VII); Robert Bobb (Count VIII), Berry Greer (Count IX), and Monique McMurtry (Count X).  In Count XV, the complaint pleads a claim of gender harassment under Title IX against defendant DPS only.

In Count XI, the amended complaint raises a claim under Elliott-Larsen against defendant Charles Pugh individually and defendant DPS as Pugh's putative employer.

In Count VI, the amended complaint raises a claim against defendant Pugh individually for violation of the Due Process Clause and 42 U.S.C. § 1983.  In Counts XII through XIV, the amended complaint raises state law claims against Pugh for assault (Count XII), battery (Count XIII), and intentional infliction of emotional distress (IIED) (Count XIV).

## II.

All defendants have moved for summary judgment under Federal Rule of Civil Procedure 56.  Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  576 F.3d at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Id.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could

reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). If the non-moving party, after sufficient opportunity for discovery, is unable to meet his or her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). However, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

### A.  Pugh's Motion for Summary Judgment

#### 1.  Due Process Violation Claim

In Count VI of the amended complaint, the plaintiff accuses defendant Pugh of violating his rights under the Due Process Clause, via 42 U.S.C. § 1983. The claim is based on Pugh's conduct of texting and the single incident where Pugh put his hand on the plaintiff's thigh. In the prior opinion on the DPS defendants' motion for judgment on the pleadings, the Court acknowledged that "'a schoolchild's right to personal security and to bodily integrity manifestly embraces the right to be free from sexual abuse at the hands of a public school employee.'" *Doe ex rel. Doe v. City of Roseville*, 296 F.3d 431, 438 (6th Cir. 2002) (quoting *Doe v. Claiborne County*, 103 F.3d 495, 506 (6th Cir. 1996)). Because of that recognized right, "the Due Process Clause of the Fourteenth Amendment protects the right of a child to be free from sexual abuse inflicted by a public school teacher." *Ibid.* (citing *Claiborne County*, 103 F.3d at 506). However, citing *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 726 (6th Cir. 1996), the Court held that Pugh's conduct fell short of the "conscience shocking" sort of sexual and abusive invasion of bodily integrity

-12-

required to make out a cognizable due process claim. The Court then determined that the DPS defendants could not be held liable on a supervisory liability theory because Pugh's conduct did not amount to a substantive due process violation. The same reasoning must prevail here. Pugh, therefore, is entitled to a judgment as a matter of law on Count VI of the amended complaint.

### 2. Elliott-Larsen Sexual Harassment Claim

Pugh argues that the plaintiff cannot proceed on his Elliott-Larsen claim for sexual harassment because (1) the plaintiff was not a member of any "protected group," since the last day of classes was May 31, 2013, and the alleged harassment occurred on or after that day, when the plaintiff no longer was either a minor or a student; (2) the conduct was not "unwelcome" because the plaintiff willingly participated in the negotiations to trade his video for money; and (3) Pugh's conduct could not have interfered with the plaintiff's education, because the plaintiff no longer was a student at the time of the alleged harassment.

The Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.*, prohibits any educational institution from "[d]iscriminat[ing] against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of religion, race, color, national origin, or sex." Mich. Comp. Laws § 37.2402(a). The Act defines the term "educational institution" to "mean[] a public or private institution, or a separate school or department thereof," including any "academy, college, elementary or secondary school, [or] local school system," as well as any "agent of an educational institution." Mich. Comp. Laws § 37.2401. The Act further specifies that "[d]iscrimination because of sex includes sexual harassment." Mich. Comp. Laws § 37.2103(*i*). And sexual harassment includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication

of a sexual nature [that] . . . has the purpose or effect of substantially interfering with an individual's . . . education . . . or creating an intimidating, hostile, or offensive . . . educational . . . environment. *Ibid.*; *see also Hamed v. Wayne County*, 490 Mich. 1, 9-10, 803 N.W.2d 237, 244 (2011) (describing this section of the statute as "refer[ring] to hostile-environment sexual harassment").

In order to establish a *prima facie* case under the hostile environment theory, the plaintiff must show that: (1) he belonged to a protected group; (2) he was subjected to communication or conduct on the basis of sex; (3) he was subjected to unwelcome sexual conduct or communication; (4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the student's access to education or created an intimidating, hostile, or offensive educational environment; and (5) *respondeat superior. Radtke v. Everett*, 442 Mich. 368, 382-83, 501 N.W.2d 155, 162 (1993) (citing Mich. Comp. Laws §§ 37.2103(h), 37.2202(1)(a)).  The first element will be satisfied where the plaintiff shows that he is a student "who has been the object of unwelcomed sexual advances," since "all [students] are inherently members of a protected class in hostile . . . environment cases because all persons may be discriminated against on the basis of sex." *Id.* at 383, 501 N.W.2d at 162.  The second element likewise will be satisfied where the plaintiff "alleges that [he] was subjected to harassment on the basis of sex." *Ibid.*  "The ELCRA hostile work environment analysis is identical to Title VII's analysis," and "when Title VII and ELCRA have similarly worded provisions, Michigan courts often interpret ELCRA provisions using Title VII case law." *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012).

The plaintiff has submitted sufficient evidence from which a jury reasonably could conclude that he was subjected to sexual harassment by Pugh and that Pugh's harassing conduct had "the effect of substantially interfering with [his] education" or "creat[ed] an intimidating, hostile, or

offensive . . . educational . . . environment."  There is no question that the onslaught of sexually explicit text messages and solicitations for the plaintiff to make an explicit video in exchange for money qualify as sexual harassment under the Elliott-Larsen Act.  "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature."  Mich. Comp. Laws § 37.2103(*i*).  The conduct in this case plainly satisfies that definition.

The plaintiff did not testify that he was subjected to any explicitly sexual verbal comments by Pugh before the text messages that were sent in the several days starting on May 31, 2013 and continuing into early June.  But the definition of sexual harassment under the Elliott-Larsen Act is not limited to explicit sexual comments; it prohibits any form of "conduct" or "communication" of a sexual nature.  The plaintiff testified that, during the leadership forum meetings, which were held every Wednesday on school grounds, in the middle of the school day, he was persistently and repeatedly subjected, in the course of every weekly meeting, to Pugh's overtly sexual gazes and "flirting."  The sexual nature of Pugh's conduct during the meetings was blatant, and his intent was apparent to the plaintiff as well as his classmates.  Moreover, the plaintiff's mother testified that Pugh sent sexually explicit text messages to her phone, which evidently were intended for the plaintiff, as early as October 2012.  Even if the plaintiff never saw those messages, at a minimum they are evidence of Pugh's intent, from the outset of the 2012-13 school year, to exploit his position of trust and authority, as a "mentor" in the leadership forum program, in order to develop an inappropriate sexual relationship with the plaintiff.  And Pugh's overt conduct in the late spring of 2013 corroborates the plaintiff's claims of "flirting" during the class periods.

The sexual nature of Pugh's conduct was in fact so apparent to all of the students present at the leadership classes that his unvarnished expressions of sexual attraction toward the plaintiff provoked classmates to spread rumors that the plaintiff himself was gay and was romantically involved with Pugh. The plaintiff has convincingly described how those rumors, and the plaintiff's resulting embarrassment and distress, significantly interfered with his education and created a hostile educational environment which ultimately resulted in the plaintiff's feelings of depression, withdrawal, and isolation, as well as the loss of his friends and a breakdown in his relationship with his family. Pugh argues otherwise, but his conduct cannot be excused merely because the plaintiff was able to continue his education and eventually to graduate from the Douglass Academy. *Wasek*, 682 F.3d at 470 ("[I]t does not affect our analysis that [the plaintiff] was able to continue doing his job and give his best effort."); *Gallagher v. C.H. Robinson Worldwide, Inc.*, 567 F.3d 263, 274 (6th Cir. 2009) ("[A] plaintiff need not prove a tangible decline in her work productivity; only 'that the harassment made it more difficult to do the job.'" (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 567 (6th Cir. 1999))). And the effect of Pugh's harassment ultimately is a question for the jury, in light of the evidence presented thus far.

Moreover, Pugh does not dispute that, entirely aside from his conduct during the leadership forum meetings, he made ceaseless, insistent, explicit demands via text messaging for the plaintiff to deliver a video of himself masturbating for Pugh's personal pleasure, and with the promise of lavish gifts and helpful attention if the plaintiff continued to produce such material to satisfy Pugh's appetites. Those demands, which indisputably constituted unwelcome sexual conduct and advances, occurred over the course of several days between the last day of the plaintiff's classes and his day of graduation. The fact that some, or even most, of the activity in question occurred outside of

-16-

normal school hours or off school grounds does not remove the conduct from the reach of the Elliott-Larsen Act's prohibition on sexual harassment.  The Seventh Circuit considered similar facts in a case in which an adult supervisor leveraged his previously asserted workplace authority and the relationship he had cultivated with an underage female employee into a sexual encounter that occurred outside the workplace, two weeks before the plaintiff's employment ended.  The court of appeals found the conduct actionable under Title VII and explained:

> [S]exual harassment is actionable under [Title VII] only when it affects the plaintiff's conditions of employment.  The sexual act need not be committed in the workplace, however, to have consequences there. . . .  But at the very least the harassment must [] be an episode in a relationship that began and grew in the workplace.  Had [the defendant] met [the plaintiff] on the last day of [her] employment . . . and later asked her for a date that eventually culminated in sexual intercourse, the connection to the workplace would have been too attenuated to constitute workplace harassment.  It would have been no different from his asking a customer for a date.
>
> But that is not what happened.  The relationship began with flirtatious talk and erotic touching in the workplace and continued there for nine months before [the defendant] and [the sixteen-year-old plaintiff] had sex.  Nor did it end with their sexual encounter.  She continued working at the ice cream parlor in close proximity with her harasser — indeed under his supervision — after the statutory rape, though for less than two weeks.  Because her consent to have sex with [the defendant] was, as a matter of law, ineffectual, this is a case of a worker subjected to nonconsensual sex by a supervisor or at least quasi-supervisor . . . during, as well as arising from, the employment relation.  That is a sufficiently strong case of workplace sexual harassment to withstand summary judgment.

*Doe v. Oberweis Dairy*, 456 F.3d 704, 715-16 (7th Cir. 2008).  Similarly in this case, the evidence supports the argument that Pugh leveraged the feelings of dependency, trust, and submission to his authority and position as a "mentor" that he cultivated in the plaintiff over the course of an entire school year.  The encounters with the plaintiff just days before his graduation were Pugh's plainly-intended endgame from the outset of his interactions with the plaintiff, which featured continual "flirting" during the forum meetings and sexually explicit text messages that Pugh attempted to send

the plaintiff as early as October 2012. The fact that the ultimate escalation of Pugh's scheme happened to occur within a few hours or days after the plaintiff finished his last day of classes, and a week before he graduated, does not render either his deplorable conduct, or the school district's failure to take any measures to prevent it, immune from liability under the Elliott-Larsen Act.

## 2.  IIED Claim

Pugh argues that the plaintiff cannot sustain his IIED claim, because "[t]he exchange of sexually explicit text messages and Plaintiff selling a video of himself is hardly outrageous. This occurred between two consenting adults. Among 18-24 year olds in America, 44% receive sexual based messages." Pugh contends that the plaintiff was a "willing participant" in the exchange, and that "[w]hile [the plaintiff] may now regret what he did, his regrettable conduct does not give rise to a cause of action against Mr. Pugh." Pugh contends, moreover, that the plaintiff cannot show that Pugh's conduct caused the alleged harm, because his "loss of friends" was precipitated by media attention after the plaintiff's own mother contacted Channel 7 News about the incidents, and the plaintiff's family "disowned him" because they are homophobic, not because of what Pugh did.

"'To establish a prima facie claim of intentional infliction of emotional distress, the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff.'" *Lucas v. Awaad*, 299 Mich. App. 345, 359, 830 N.W.2d 141, 150 (2013) (quoting *Dalley v. Dykema Gossett*, 287 Mich. App. 296, 321, 788 N.W.2d 679, 694 (2010)).  "'Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Ibid.* (quoting

*Doe v. Mills*, 212 Mich. App. 73, 91, 536 N.W.2d 824, 833 (1995)).  "Accordingly, '[l]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" *Ibid.* (quoting *Mills*, 212 Mich. App. at 91, 536 N.W.2d at 833).

The plaintiff has submitted sufficient evidence from which a jury reasonably could conclude that Pugh's "extreme and outrageous conduct," which Pugh readily admits he deliberately and persistently engaged in, caused the plaintiff "severe emotional distress."  The record evidence supports the contention that Pugh's overt and predatory harassment of a vulnerable young man entrusted to his "mentorship" throughout the course of the year-long leadership forum program qualifies as "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  The record also suggests that the conduct caused the plaintiff severe emotional distress resulting from the loss of his friends and the destruction of his family relationships, and it also caused the plaintiff to be unable to focus on his studies, and ultimately to withdraw from and abandon his ambition to further his education by attending college.

Pugh's motion for summary judgment therefore will be denied as to all but Court VI of the amended complaint.

### B.  DPS Defendants' Motion for Summary Judgment

#### 1.  Elliott-Larsen Sexual Harassment Claim

The DPS defendants argue that (1) the plaintiff has not presented any evidence that any of the defendant school officials were given any notice of the text messages sent by Pugh or Pugh's touching of the plaintiff's thigh; (2) as a matter of law, the defendants cannot be held liable for failing to prevent harassment that they knew nothing about; and (3) there is no evidence that any of

-19-

the alleged harassment occurred on school grounds or during school hours.  Although they do not

directly address the *respondeat superior* element of the plaintiff's the Elliott-Larsen claim, at least

by name, these arguments tend to attack that element.

"When the harassment was committed by an agent and the plaintiff is pursuing a civil rights

claim against the principal . . . a court must [] determine the extent of the employer's vicarious

liability."  *Radtke*, 442 Mich. at 382-83, 501 N.W.2d at 162 (quotations omitted).  "Thus, if a

defendant is not vicariously liable for the acts of its agent under traditional principles of *respondeat*

*superior*, the plaintiff's claim under [the Elliott-Larsen Act] fails as a matter of law."  *Ibid.*  The

Michigan Supreme Court has promulgated the rule that "an employer is not liable for the torts

committed by an employee when those torts are beyond the scope of the employer's business."

*Hamed*, 490 Mich. at 10, 803 N.W.2d at 244.  But that rule is not immutable and  allows for

exceptions.

> The general rule that an employer is not liable for acts of its employee outside the
> scope of its business . . . does not preclude vicarious liability in every instance. This
> Court has consistently recognized that an employer can be held liable for its
> employee's conduct if the employer knew or should have known of the employee's
> propensities and criminal record before that employee committed an intentional tort.
> This inquiry involves an analysis of whether an employer had (1) actual or
> constructive knowledge of prior similar conduct and (2) actual or constructive
> knowledge of the employee's propensity to act in accordance with that conduct.
> Under this two-pronged approach, the conduct at issue may be so close in time to
> prior similar conduct that knowledge under the first prong gives rise to a valid
> inference that the conduct was foreseeable under the second prong.  Conversely, if
> an employee's actions were temporally distant and the employee's recent record
> suggested a change in character, foreseeability would not be established.

*Id.* at 11-12, 803 N.W.2d at 244-45 (quotation marks and footnotes omitted).

The evidence presented by the plaintiff shows that Pugh's conduct may be imputed to DPS

and to the individual school administrator defendants under the doctrine of *respondeat superior*,

-20-

because it satisfies both elements noted above.  Ida Short testified that she and the other members of the school board during her tenure were well aware of Pugh's reputation for having inappropriate relationships with school-age boys, and that the members of the school board "made sure the emergency managers — Roy Roberts and Robert Bobb — were aware of [their] concerns and the reasons behind them."  Short's fellow school board member Tawanna Simpson had personally observed Pugh on a "date" with a 15- or 16-year-old boy, who referred to Pugh as his "boyfriend," and she stated that her concerns, and those of other board members, were conveyed directly to Emergency Manager Roy Roberts by her fellow board member Lamar Lemmons.  Pugh's improper conduct was flagged and identified to the individual DPS defendants.

Knowledge of Pugh's tendency to replicate that conduct is corroborated by Elena Herrada's report of a meeting that she attended where Lemmons told Roberts that Pugh should not be allowed to conduct his mentorship program at the Douglass Academy, because he had a history of inappropriate relationships with young boys.

That evidence is sufficient to require a trial on the plaintiff's Elliott-Larsen sexual harassment claim against the DPS defendants.

## 2. Title IX Claim

The DPS defendants argue that the plaintiff cannot make out a *prima facie* case under Title IX, because (1) there is no evidence that principal Berry Greer had any knowledge of the harassing text messages sent by Pugh; (2) it is undisputed that the overtly sexual text messaging began on the last day of school and ended four days later, and the plaintiff graduated from the Academy a week after Pugh's texting stopped; (3) neither the plaintiff nor his mother complained about Pugh's conduct until after it ended, and neither of them ever complained to defendants Bobb, Roberts, or

-21-

Greer; and (4) there is no evidence that any of the school officials or the district itself had any control over Pugh's purely private conduct that occurred off school grounds, after school hours, in part over a weekend, and via private text message communications between Pugh and the plaintiff.

Title IX of the Education Amendments of 1972 "provides that 'No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.'" *Williams ex rel. Hart v. Paint Valley Local Sch. Dist.*, 400 F.3d 360, 366 (6th Cir. 2005) (quoting 20 U.S.C. § 1681(a)). "This includes the duty not to discriminate on the basis of sex, which encompasses a teacher's sexual harassment of a student." *Ibid.* (citing *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 282 (1998)).

"In *Gebser*, which involved the harassment of a student by a teacher, it was established by the Supreme Court that a school district can be held liable in damages for . . . sexual harassment if it is proven that the school district had actual notice and exhibited deliberate indifference to the alleged harassment." *Ibid.* (citing *Gebser*, 524 U.S. at 292). "*Gebser* explained that deliberate indifference of a school district is shown where there is an official or other person with authority to take corrective action, who has actual knowledge of the abuse, and fails adequately to respond." *Ibid.* (quotations and citations omitted). School officials may be "deemed 'deliberately indifferent' to acts of [] harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Davis ex rel LaShonda D. v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999). Although *Davis* concerned "student-on-student" harassment, the Sixth Circuit has held that the same "deliberate indifference" standard announced by the Supreme Court in that case also applies to teacher-on-student cases. *Williams*, 400 F.3d at

367 ("It is clear from a reading of *Gebser* and *Davis*, that the Court is discussing only one standard for 'deliberate indifference' in Title IX pupil harassment cases and not, as [the plaintiff] contends, one standard for student-on-student harassment and a less stringent standard for teacher-on-student harassment.").

The record here establishes, at a minimum, that defendant Roy Roberts had actual knowledge of Pugh's inclination to engage in inappropriate relationships with school-age boys, and the DPS defendants have not offered any evidence that either Roberts or any of the school officials under his authority took any action to terminate Pugh's access to the students at the Douglass Academy. Moreover, it appears that, contrary to the district's policies regarding the volunteer program, Pugh and the members of his mentorship team never were subjected to any background checks, and school officials present at the time of the forum meetings made, at best, no more than token efforts to attend those meetings or to observe Pugh's behavior toward the students. Roberts's failure to take any action either to detect or to prevent Pugh's harassment of the plaintiff plainly was unreasonable in light of his actual knowledge of Pugh's inclinations.

That evidence is sufficient to create a question of fact on the plaintiff's Title IX claim that warrants jury resolution.

### III.

Defendant Charles Pugh is entitled to a judgment as a matter of law on the plaintiff's claim in Count VI of the amended complaint alleging a violation of his substantive due process rights. However, fact questions preclude summary judgment on the remaining claims.

Accordingly, it is **ORDERED** that the motion for summary judgment by defendant Charles Pugh [dkt. #65] is **GRANTED IN PART AND DENIED IN PART**.

-23-

It is further **ORDERED** that Count VI of the amended complaint is **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the motion for summary judgment by defendant Detroit Public Schools, Roy Roberts, Robert Bobb, Berry Greer, and Monique McMurtry [dkt. #66] is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   September 16, 2015

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 16, 2015.

s/Susan Pinkowski
SUSAN PINKOWSKI

---